In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3968

KEVIN L. HOUGH,

Petitioner-Appellant,

v.

RONDLE ANDERSON,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 98 C 246--Allen Sharp, Judge.

ARGUED SEPTEMBER 14, 2000--DECIDED November 20, 2001


  Before RIPPLE, DIANE P. WOOD and EVANS,
Circuit Judges.

  RIPPLE, Circuit Judge.   Kevin Hough was
convicted of the murders of Ted Bosler
and Gene Rubrake in the Superior Court of
Allen County, Indiana, and was sentenced
to death. After exhausting his state
remedies, Mr. Hough filed a petition for
a writ of habeas corpus in the district
court. The district court denied the
petition, but granted Mr. Hough a
certificate of appealability. For the
reasons set forth in the following
opinion, we affirm the judgment of the
district court.

I

BACKGROUND

A.  Facts

  On November 6, 1985, Mr. Hough and his
younger brother, Duane Lapp, set out for
the home of Ted Bosler and Gene Rubrake.
Once there, Mr. Hough approached Rubrake
and helped him unload groceries from his
car; Lapp accompanied Mr. Hough. Mr.
Hough then followed Rubrake into the
basement where Bosler joined them. Once
in the basement, Mr. Hough pulled a .45
caliber pistol from his shoulder holster
and told Bosler and Rubrake to lie down
on the floor. Rubrake swung at Mr. Hough

with the television remote control. Mr. Hough responded by shooting Rubrake in the chest. Bosler, however, dropped to the floor; Mr. Hough then shot Bosler while he was lying on the floor. When Rubrake appeared to move, Mr. Hough shot him in the face. Mr. Hough and Lapp then started up the stairs, but Mr. Hough returned to the basement to retrieve a beer can and a remote control that, he believed, might contain his fingerprints. While in the basement, Mr. Hough also removed several rings from the bodies of Bosler and Rubrake. As Mr. Hough left the basement, he stepped on Rubrake's face.

After the murders, Mr. Hough took Lapp back to his (Mr. Hough's) home. There, Mr. Hough packed and left for Indianapolis with his fiancee, Noreen Akers.

Less than a month before the Bosler/Rubrake murders, Mr. Hough had committed another murder. On October 27, 1985, Mr. Hough had told his friend, Juan Fernandez, that "[t]onight's the night to hit Greg Nicola's house." Tr. 1210, State's Ex.21. Then Mr. Hough, Fernandez, and another man, Donald Maley, went to the home of Greg Nicola for the purpose of evaluating the prospects of robbing the house. Mr. Hough directed Fernandez to park approximately three to four blocks away on another street; Mr. Hough and Maley left the car and went to the house. When Antoni Bartkowiak answered the door, Mr. Hough stuck a .45 caliber handgun into his stomach and backed him into the residence. Mr. Hough made Bartkowiak lie down on the floor, and Mr. Hough and Maley handcuffed Bartkowiak's hands behind his back. Mr. Hough discovered a semi-automatic weapon and shells in the house, which he handed to Maley. Mr. Hough then told Maley to hold it against Bartkowiak and use it if necessary. Mr. Hough then searched the house.

After ransacking the house, Mr. Hough questioned Bartkowiak regarding cocaine that he believed to be in the residence. When Bartkowiak denied knowledge of the cocaine, Mr. Hough used a device to inflict electric shocks on Bartkowiak. Mr. Hough and Maley then took Bartkowiak to the basement. En route downstairs, Mr. Hough instructed Maley to return to the main floor to get a cushion from the

couch. Once in the basement, Mr. Hough forced Bartkowiak to lean over a rollaway bed. Mr. Hough then took the cushion, placed it over the back of Bartkowiak's head and shot Bartkowiak.

After the murder, Mr. Hough and Maley returned to the car and left for home. Mr. Hough took two bags of stolen items to the basement of the house and emptied the contents. Mr. Hough then gave Maley $80 and stated that it came from Bartkowiak's wallet. He also told Maley that he could have the shotgun, but Maley declined. After complaining to Mr. Hough that he had not gotten his share, Maley left. After that, Mr. Hough told Fernandez that he had found an additional $400, but that he did not wish to divide it with Maley because Maley had not done his part. A few days later, Mr. Hough gave Fernandez the .25 caliber semi-automatic weapon and told him to dispose of it; Fernandez did so.

Mr. Hough was tried and convicted for the murder of Bartkowiak in November 1986./1 These proceedings were given significant coverage in the Fort Wayne newspapers.

B.   State Court Proceedings

1.

Mr. Hough's Trial

Mr. Hough's trial for the Bosler/Rubrake murders was scheduled to take place less than three months after his conviction for the Bartkowiak murder. Because of the extensive press coverage that the trial for the Bartkowiak murder had received, counsel for Mr. Hough requested a change of venue. The court denied the request for change of venue, but ordered that the jury be chosen from Marion County.

During this same time frame, Mr. Hough requested that he be allowed to act as co-counsel with his attorneys because he believed that they had not represented him adequately in the Bartkowiak trial. The court denied the request, but allowed one of Mr. Hough's attorneys to withdraw. The court then appointed another attorney to assist the remaining attorney with Mr. Hough's representation. At the request of the defense, the trial was then postponed until May 1987.

When the trial commenced, Maley testified against Mr. Hough pursuant to a plea agreement. Although Maley had not been present at the Bosler/Rubrake murders, he had seen Mr. Hough both before and after the murders, and he was called to testify about conversations he had with Mr. Hough at those times. After Maley testified, defense counsel began to cross-examine him about his plea agreement. The prosecutor then requested a side bar. During the ensuing colloquy with the judge, the prosecutor suggested that, if defense counsel cross-examined Maley on the plea agreement, it would open up the door to questions as to whether Mr. Hough was present at, and convicted for, another murder. Defense counsel acknowledged that he may be opening the door to such questioning, but nevertheless wanted to pursue this course. After the side bar concluded, defense counsel asked Maley if the plea agreement "involve[d] not being charged with an unrelated murder" and whether he "was involved in an unrelated murder and . . . [was] not charged with that crime." Tr. 900-01.

During the redirect examination of Maley, the prosecutor focused on the opening created by defense counsel's inquires into the plea agreement. Initially, the prosecutor limited his questions to the requirements of the agreement. He also, however, asked Maley whether the plea agreement required him to testify against Mr. Hough in the Bartkowiak case and whether Maley was present when Mr. Hough killed Bartkowiak. Further inquiries into the Bartkowiak murder, however, met with objections from defense counsel.

The prosecutor then moved to admit Maley's plea agreement. He next asked Maley whether he had fulfilled the plea agreement by testifying against Mr. Hough, whether Mr. Hough had been convicted of that murder and who had killed Bartkowiak. Before Maley could respond to this last question, defense counsel objected on the ground that this was an attempt to retry the Bartkowiak murder and to elicit the details of the Bartkowiak murder, and that it was beyond the scope of cross-examination. The prosecutor, however, replied that he only was trying to determine if Maley "killed

anyone that day." Id. at 925. On that basis, the court overruled the objection.

On the second redirect, the roles of Maley and Mr. Hough in the Bartkowiak murder arose again. Specifically, the prosecutor asked Maley whether he knowingly had committed a burglary, whether Mr. Hough was involved and whether Mr. Hough "shot a man to death." Id. at 933. While Maley was answering the question, defense counsel objected to both the question and response. The court, however, overruled the objection on the ground that the matter already had been covered.

During the trial, Mr. Hough also took the stand in his own defense. Mr. Hough tried to explain why Maley and his brother, Duane Lapp, would testify against him and accuse him of murder. Also, at the request of defense counsel, Mr. Hough detailed his criminal record, including his prior conviction for homicide. At the end of his examination, defense counsel asked Mr. Hough whether he had "murder[ed] those two men." Id. at 1105. Mr. Hough responded, "No, I did not." Id.

The prosecutor then cross-examined Mr. Hough about Maley's testimony against him in the Bartkowiak trial. One of the last questions focused on whether Bartkowiak was handcuffed at the time of the murder. At that point, defense counsel interrupted on the basis that, again, the prosecutor was attempting to retry the Bartkowiak case. The prosecutor stated that he would move on. On recross, the prosecutor again returned to the robbery prior to the Bartkowiak murder. The court sustained the objection to this line of inquiry and noted that "[i]t sounds to me like we're retrying the case." Id. at 1132.

After the trial concluded, the jury deliberated and returned a verdict against Mr. Hough. The case then proceeded to the sentencing phase. The state submitted that Mr. Hough was eligible for the death penalty based on three statutory aggravating circumstances: 1) double murder; 2) murder during robbery or attempted robbery; and 3) prior murder conviction. During its opening instructions to the jury, the court stated that "[y]ou may recommend the death penalty, only if you

find, one, that the State of Indiana has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists, and two, that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Id. at 1198-99. Later in the instructions, the court paraphrased the standard, stating, "[i]f the State failed to prove beyond a reasonable doubt the existence of at least one aggravating circumstance, or if you find that any mitigating circumstances outweigh the aggravating circumstances, you should not recommend the death penalty." Id. at 1199. The court later restated the standard as it had initially. Defense counsel did not object to any part of this instruction.

The first witness for the state during the sentencing phase of trial was a court clerk who testified to Mr. Hough's conviction for the Bartkowiak murder and brought with her some records of that conviction, collectively State's Exhibit 21. The exhibit contained findings by the presiding judge in the Bartkowiak case of aggravating circumstances including a description of the "viciousness and senselessness of the murder" and the fact that the judge had found no mitigating circumstances. Id. at 1210, State's Ex.21. Also included was the probable cause affidavit based on the statement of Juan Fernandez, which set forth the Bartkowiak murder in great detail. Defense counsel stipulated to the admission of Exhibit 21.

Defense counsel then offered evidence in mitigation. The first piece of evidence was Mr. Hough's juvenile record. The defense also presented testimony from Mr. Hough's former probation officer, John Mauch, that Mr. Hough was raised in a highly dysfunctional family, that Mr. Hough was an unloved and unwanted child, and that his home life was extremely negative. On cross-examination, the prosecutor elicited, without objection, that in 1976 Mr. Hough had been charged with armed robbery and that the case had been transferred to adult court, that he had a history of juvenile offenses, and that he had robbed a man while armed with a gun. Mauch, at the request of the prosecutor, also read from a report compiled as a result of the armed robbery charge. The lengthy report was a

psychological analysis of Mr. Hough that included statements that Mr. Hough had expressed little or no remorse and had taken no responsibility for the offense. The report also characterized Mr. Hough as "deeply troubled" and having little feeling for others. Id. at 1227.

Mr. Hough's counsel next presented the videotaped testimony of Elroy Szabo, another of Mr. Hough's probation officers. Szabo stated that Mr. Hough had a very unhappy childhood, that his mother was extremely negative and abusive, and that he lacked a male role model. Szabo's reports also were entered into evidence.

Taped testimony of another probation officer followed. Several family members then testified to Mr. Hough's terrible childhood. Mr. Hough did not testify at the death penalty hearing.

The parties then proceeded to closing arguments. Much of the state's closing argument was dedicated to reviewing the law of aggravation and mitigation, the weighing process, and how the prosecutor believed the evidence should be weighed. However, during the course of the argument, the prosecutor also returned to the specific facts of the Bartkowiak murder. He argued that the death penalty should be imposed because it would stop the drug flow from Indianapolis to Fort Wayne, that the evidence in mitigation should be discounted because Mr. Hough's mother was not the killer, that if you let a wolf "out in the sheep that wolf will kill every time," Tr. 1339, and that it was possible to kill by commission or omission.

The jury deliberated and recommended that Mr. Hough be sentenced to death. The judge agreed with the recommendation and sentenced Mr. Hough to death. Mr. Hough then appealed.

2.

State Court Appeals and Postconviction Proceedings

The state supreme court affirmed the conviction and the sentence. Hough v. State, 560 N.E.2d 511 (Ind. 1990). Two justices dissented on the ground that Mr. Hough had not been convicted of the Bartkowiak murder at the time he

committed the Bosler/Rubrake murders, and therefore the fact of a prior conviction should not have been used as an aggravating factor. One of those justices also took the view that the majority had used the improper standard in reviewing instructional error. Id. at 521-22.

Mr. Hough then filed for state postconviction relief. In his petition, he claimed that he had received ineffective assistance of counsel at trial and on his direct appeal. He argued that his counsel's failure to object to the admission of a probable cause affidavit constituted ineffective assistance of counsel. Relying on its decision in Maisonet v. Indiana, 448 N.E.2d 1052, 1055-56 (Ind. 1983), the Supreme Court of Indiana, however, held that, in light of the evidence and aggravating factors, Mr. Hough was not prejudiced by any additional evidence contained in the affidavit. See Hough v. State, 690 N.E.2d 267, 270-71 (Ind. 1998). Mr. Hough also argued that his counsel was ineffective because he failed to object to an improper closing argument by the state. The Supreme Court held that several of the prosecutor's arguments were improper. "However," it stated, "in the context of this trial we do not believe that the defendant was placed in grave peril because, even without these remarks, the jury was still confronted with three substantial aggravating factors." Id. at 270. With respect to Mr. Hough's other evidentiary arguments, many made with only passing citation to the record, the Supreme Court of Indiana stated:

In defendant's final argument concerning counsel's failure to object, he challenges, again without legal citation, some evidence which was admitted without an objection. Defendant argues that he was prejudiced because the evidence (such as his juvenile record and facts concerning the prior murder conviction) added non-statutory aggravating factors to the jury's consideration. However, the jury was instructed to consider only the three alleged aggravating circumstances. Furthermore, there is no indication that this evidence amounted to any prejudice as the jury was presented with evidence of three aggravating circumstances, and we do not believe defendant has shown a reasonable probability that the outcome

would have been different absent these pieces of evidence.

Id. at 271-72.

Finally, Mr. Hough argued that the trial court erroneously led the jury to believe both that the defendant had the burden of proving any mitigating circumstances beyond a reasonable doubt and that the jury had to find unanimously that defendant had met this burden before balancing the aggravating and mitigating factors. However, the court determined that the instructions did not mislead the jury regarding the burden of proof and therefore did not jeopardize Mr. Hough's due process rights under Mills v. Maryland, 472 U.S. 320 (1985). The Supreme Court of Indiana held that the portion of the instructions that the defendant found objectionable simply paraphrased the statutory language as it existed at the time. See Hough, 690 N.E.2d at 274.

C.  Disposition of Habeas Petition in District Court

After he had exhausted state remedies, Mr. Hough filed a petition for writ of habeas corpus in district court. The district court for the Northern District of Indiana denied Mr. Hough habeas relief because it found that the decision of the Supreme Court of Indiana did not constitute an unreasonable application of federal law as stated by the Supreme Court of the United States. The district court, however, issued a certificate of appealability with respect to the ineffective assistance of counsel claim based on counsel's failure to object to the prosecutor's misconduct, failure to object to specific evidence relating to the Bartkowiak murder, introduction of petitioner's criminal record, and cumulative errors. The court also issued a certificate for Mr. Hough's due process claim arising from the alleged instructional error.

II

ANALYSIS

On appeal, Mr. Hough maintains both that his trial counsel was constitutionally ineffective and also that instructional error occurred in his trial that resulted

in a violation of his due process rights. We address each of these contentions below.

A.  Standard of Review

Mr. Hough filed his petition for a writ of habeas corpus on August 11, 1998, after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), P.L. 104-132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. sec. 2254). The provisions of this statute therefore govern our review. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). AEDPA directs that, if a constitutional claim was adjudicated on the merits by the state courts, a federal court may only grant habeas relief based on that claim if (1) the state court's decision was contrary to or an unreasonable application of federal law as determined by the Supreme Court of the United States, or (2) the state court's determination of the facts was unreasonable in light of the evidence presented./2 See 28 U.S.C. sec. 2254(d).

The Supreme Court provided guidance as to how to conduct the review required by AEDPA in Williams v. Taylor, 529 U.S. 362 (2000). A state court's decision is "contrary to" established Supreme Court precedent when it applies a rule that contradicts the governing law set forth in Supreme Court cases. Id. at 405. A state court decision also is contrary to Supreme Court precedent when it confronts a set of facts that is materially indistinguishable from those of a decision of the Supreme Court and nevertheless arrives at a decision different from that reached by the Supreme Court precedent. See id. at 406. In this case, the Supreme Court of Indiana correctly identified Strickland v. Washington, 466 U.S. 668 (1984), as the controlling precedent for Mr. Hough's ineffective assistance of counsel claims, and Mills v. Maryland, 486 U.S. 367 (1988), as the controlling precedent for his instructional error claim. Thus, we are unable to say that the court's decision was contrary to established federal law. Mr. Hough is not entitled to habeas relief on this ground.

It remains to be determined, however, whether the state court's conclusion resulted from an unreasonable application

of the principles established in Strickland and Mills. The Supreme Court has made clear that an incorrect application is not necessarily an unreasonable one. See Williams, 529 U.S. at 410. A federal court may not issue a writ of habeas corpus "simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

## B.  Ineffective Assistance of Counsel

Mr. Hough argues that he was rendered ineffective assis-tance of counsel by his attorneys' failure to object to various pieces of evidence introduced during the guilt and punishment phases of his trial. Specifically, Mr. Hough maintains that his counsel should have objected to the prosecutor's questioning of Maley concerning the details of the Bartkowiak murder. Mr. Hough also believes his counsel should have objected to various questions put to him on cross-examination. Additionally, Mr. Hough takes issue with his counsels' failure to object to prejudicial documents introduced during the sentencing phase of his trial. Finally, Mr. Hough believes defense counsel should have objected to portions of the prosecutor's closing argument during the sentencing phase of trial. We address each of Mr. Hough's arguments below, but first review the constitutional standards according to which we must evaluate Mr. Hough's claims.

## 1.

### Constitutional Standards

Under the familiar test established in Strickland v. Washington, 466 U.S. 668 (1984), a convicted defendant who claims that his counsel's assistance was so defective as to require a reversal of a conviction (or death sentence in the context of a capital sentencing proceeding) must establish two components. First, he must demonstrate that his counsel's performance fell below an objective standard of reasonableness. See id. at 688. Second, he must demonstrate that he was prejudiced by the deficient performance. See id. at 687.

Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 694. If the defendant makes an insufficient showing on one prong of the test, a court need not consider the remaining prong.

### a. Deficient Performance

A defendant who complains that his counsel was ineffective must show that counsel's representation fell below an objective standard of reasonableness. See id. at 688. Reasonableness is measured under prevailing professional norms. See id. Counsel owes a criminal defendant certain basic duties. For example, counsel owes a duty to avoid conflicts of interest, to advocate the defendant's cause and to consult with the defendant on important decisions. Furthermore, counsel has a duty to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." Id. "These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance." Id. The controlling inquiry is whether "counsel's assistance was reasonable considering all the circumstances." Id.

Our review of the performance of counsel must be "highly deferential." Id. at 689. We must presume that counsel's conduct falls within the wide range of reasonable professional assistance; to prevail, the defendant must overcome the presumption that the challenged act or omission might have been considered sound trial strategy. See id. Furthermore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

### b. Prejudice

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 690. In

order to constitute ineffective assistance, the deficiencies must have been prejudicial to the defense./3 In defining "prejudice," the Court noted that it is not enough for the defendant to show that his counsel's errors had some conceivable effect on the outcome of the proceeding, id.; the Court has stated that the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. In weighing the effect of counsel's errors, the court must consider the totality of the evidence before the judge or jury. Consequently, a verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record. Id. at 696.

The standard changes very little when applied to a capital sentencing proceeding. "Resolution of a claim of ineffective assistance of counsel at the penalty phase of a capital trial, like other claims of ineffective assistance, involves two elements: performance and prejudice." Hall v. Washington, 106 F.3d 742, 749 (7th Cir. 1997). The only difference is the question asked to determine prejudice. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. But when a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. We now evaluate the actions of Mr. Hough's counsel against these standards.

2.

Testimonial Evidence

Mr. Hough first argues that counsel rendered ineffective assistance with respect to testimony by Maley which was admitted without objection. Mr. Hough points to several places in the course of

Maley's testimony where the prosecutor asked about the details of the Bartkowiak murder, but his counsel made no objection. Additionally, Mr. Hough believes that his counsel was also ineffective in not objecting to testimony elicited from him during his cross-examination. Specifically, Mr. Hough was asked whether he was present during the Bartkowiak murder and whether he committed that murder.

The State argues in reply that the issue of ineffective assistance of counsel with respect to testimonial evidence was not properly presented before the state court or the district court, and, therefore, the argument has been waived.

a.

In Duncan v. Henry, 513 U.S. 364 (1995), the Court stated that "exhaustion of state remedies requires that petitioners fairly present federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Id. at 365 (internal quotation marks and citations omitted). This "fair presentation contemplates that both the operative facts and the controlling legal principles must be submitted to the state court." Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995); see also Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001) ("To satisfy that requirement, he must present both the operative facts and the legal principles that control each claim to the state judiciary . . . ."). "[A] prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort" has not "properly presented his claims to the state courts." O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). This failure results in a procedural default that precludes federal review. Id.; see also Wilson, 243 F.3d at 327.

In the present case, Mr. Hough did not present the issue of ineffective assistance with respect to the testimonial evidence in his petition for review to the Supreme Court of Indiana. Although he points to various parts of the state court record where he claims to have raised this issue, those sections only allege failures of his counsel to

object to State's Exhibit 21, to the inclusion of the entire guilt phase of trial in the sentencing phase, and to allegedly improper commentary on the evidence by the prosecutor. However, "the operative facts" of this claim, the failure to object to Maley's testimony on redirect and Mr. Hough's testimony on cross-examination, were not presented to the Supreme Court of Indiana for consideration. Consequently, under the standards set forth above, Mr. Hough did not fairly present this claim to the state courts; he therefore failed to exhaust his state court remedies, and this failure constitutes a procedural default of this claim./4

This conclusion, however, does not end the inquiry. "A procedural default can be overlooked when the petitioner demonstrates cause for the default and consequent prejudice, or when he shows that a fundamental miscarriage of justice will occur unless the federal court hears his claim." Wilson, 243 F.3d at 329. Mr. Hough, however, does not argue a "cause" for the failure to raise this argument in his petition to the Supreme Court of Indiana, nor does he maintain that a "fundamental miscarriage of justice" will result from a failure to consider this argument. Instead, Mr. Hough posits in his reply brief that the state has "waived any claim of waiver" for failing to argue waiver or procedural default either before the Indiana courts or the district court. We believe that this argument is without merit.

First, it was impossible for the state to rebut, in the state court, Mr. Hough's claims of ineffective assistance with respect to the testimonial evidence when those claims were not raised properly. Nor can we say that the state waived reliance on procedural default, or waiver, in the district court. Mr. Hough did not raise the issue of ineffective assistance concerning the testimonial evidence in his petition for the writ of habeas corpus. See R.12. Shortly after Mr. Hough filed his petition, the district court issued an order to show cause why the petition should not be granted. See R.20. The state then filed its response to the order and a memorandum in support of the response. See R.34. Almost two months after the state filed the response to the order to

show cause, Mr. Hough filed his memorandum in support of his petition for the writ. See R.41. It was in this memorandum that Mr. Hough raised, for the first time, the issue of ineffective assistance of counsel with respect to testimonial evidence. See id. at 32-33. Therefore, when Mr. Hough raised the issue of ineffective assistance regarding testimonial evidence, the government already had submitted its substantive memorandum and response to the court. Consequently, because of this sequence of the briefing on the petition and the order to show cause, the state cannot be said to have waived Mr. Hough's procedural default.

b.

Even if we are mistaken in our assessment of Mr. Hough's procedural default, we cannot conclude that Mr. Hough's counsel was constitutionally deficient based on his actions during the redirect of Maley and the cross-examination of Mr. Hough. Some detail is helpful in assessing counsel's performance.

During the cross-examination of Maley, defense counsel asked Maley about his plea agreement. The prosecutor then requested a side bar. During the conversation at the bench, the prosecutor suggested that, if defense counsel-cross-examined Maley on the plea agreement, "maybe it would open up the door to his client and this witness . . . and I think what [defense counsel] may be getting into may be opening cross examination as to whether his client . . . was in fact, present at another murder and convicted for it." Tr. 899-900. Defense counsel responded that he knew he would be opening the door to such questioning; indeed, when the prosecutor asked "[d]o you want to bring it out," defense counsel responded "[y]ou betcha." Id. at 900. Defense counsel then continued to cross-examine Maley concerning the Bartkowiak murder and his role in it. Defense counsel asked Maley if the plea agreement "involve[d] not being charged with an unrelated murder" and whether he "was involved in an unrelated murder and . . . [was] not charged with that crime." Id. at 900-01.

On redirect examination, the prosecuting

attorney initially focused on the language of the plea agreement. The prosecutor asked if, as part of the plea agreement, Maley had to testify against Mr. Hough for the murder of Bartkowiak and whether Maley was present when Mr. Hough killed Bartkowiak. When the prosecutor began to ask Maley about the events preceding the Bartkowiak murder, defense counsel interjected: "Your honor, I'm not sure that that's relevant. I know that I've discussed with him the plea agreement. But I do not know that it's necessary to go into the details." Id. at 921. Although the court did not rule on the objection, the question went unanswered and the prosecutor refocused his questions on the requirements of the plea agreement, what Maley's obligations were, and to what crimes Maley had pleaded guilty. The prosecutor then followed with a series of questions that elicited an objection:

Q. Alright, and you've plead guilty to Aiding Burglary?

A. Yes sir, I did.

Q. The burglary that you did with the Defendant?

A. Yes sir.

Q. On October 27, 1985?

A. Yes sir.

Q. Did an execution occur in the basement of that house?

A. Yes, it did.

Q. Who shot . . . how did the execution occur?

Id. at 922-23. After this last question, defense counsel objected that "we're getting into the details of the commission of the crime." Id. at 923. The court, however, never ruled on the objection. The prosecutor, however, replied "alright" and moved to admit the text of the plea agreement. Id.

He next asked Maley if he had fulfilled the plea agreement by testifying against Mr. Hough and if an "Allen Superior Court Jury has convicted him [Mr. Hough] of that murder?" Id. at 925. Maley

responded, "Yes, sir." Id. The prosecutor then asked Maley directly whether he (Maley) had killed Bartkowiak. However, before Maley could respond, defense counsel objected on the ground that the prosecutor was attempting to retry the Bartkowiak murder, that the question was meant to elicit the details of the Bartkowiak murder and that it was beyond the scope of cross-examination. The prosecutor, however, replied that "[t]he only thing I will ask if the Court gives its consent, is part of the plea bargain, was that this man was somehow involved in the murder. I simply want to ask him if he killed anyone that day and I will be done." Id. at 925-26. On that basis, the court overruled the objection and allowed Maley to answer the question.

On the second redirect, the issue of Maley's and Mr. Hough's roles in the Bartkowiak murder arose again. Specifically, the prosecutor asked Maley whether he knowingly had committed a house burglary, whether he had committed the burglary with Mr. Hough, and whether "while you were there, Kevin Hough shot a man to death." Id. at 933. While Maley was answering the question "[y]es, sir," id., defense counsel objected to both the question and response. He stated: "[I]t's the response that I'm objecting to and his question that I'm objecting to and that is that he was there and he's participated and he's seen somebody else do something. I'm objecting to getting into the details of the prior murder." Id. at 934. The court, however, overruled the objection because, according to the court, "that's already been covered." Id.

Later in the trial, Mr. Hough took the stand. Mr. Hough used this opportunity to give his explanation as to why Maley and Lapp had testified against him and accused him of murder. Also during his testimony, Mr. Hough detailed his criminal record, including his prior conviction for homicide. His testimony concluded with this question and response: "Kevin, did you murder those two men?" Mr. Hough responded, "No, I did not." Id. at 1105.

On cross-examination, the prosecutor questioned Mr. Hough about Maley's testimony against him in the Bartkowiak trial. The prosecutor then returned again to the Bartkowiak murder; he asked: "Why

don't you explain, Mr. Bartkowiak was handcuffed when he was shot, was he not?" Id. at 1106-07. At that point, defense counsel interrupted: "Your honor, I am reluctant to cut this off, but I'm reluctant to retry the Bartkowiak case in this proceeding and I think that, you know, if we have--," at which point the prosecutor stated that he would go on. Id. at 1107. On recross, the prosecutor again returned to the robbery prior to the Bartkowiak murder. Defense counsel allowed Mr. Hough to answer some questions, but later objected on the ground that the prosecutor appeared to be retrying the Bartkowiak murder and that the questions went beyond the scope of the redirect. The court sustained the objection, noting that "[i]t sounds to me like we're retrying the case." Id. at 1132.

In order to prove that this representation was constitutionally deficient, Mr. Hough must establish that "the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. In doing so, he must overcome the strong presumption that the challenged action, or omission, "might be considered sound trial strategy." Id. at 689 (internal quotation marks and citations omitted). In an effort to meet that standard, Mr. Hough maintains that, with respect to Maley's testimony, his counsel "made no attempt" to limit the redirect examination of Maley to the parameters of the plea agreement and to rebuff the prosecutor's efforts to introduce evidence of Mr. Hough's involvement in the Bartkowiak murder. Petitioner's Br. at 27. According to Mr. Hough, "[i]t was incumbent upon reasonably effective counsel to point this out to the court and to attempt to prevent, and at least minimize, the prosecutor's inquiry into the facts of the Bartkowiak murder." Id.

We cannot conclude that the performance of Mr. Hough's counsel falls outside the wide range of constitutionally permissible decisions. To save his client, defense counsel had to impeach, in some way, the credibility of Maley and other witnesses. With respect to Maley, the most effective means of doing so was by way of the plea agreement. The plea agreement was however, as Mr. Hough

points out, a two-edged sword: Once it was used to cross-examine Maley, the prosecution was free to explore the parameters of the plea agreement, including Maley's testimonial duties pursuant to the agreement./5 At that point, counsel had to walk a fine line: He had to monitor the prosecutor's questions closely to make sure that Mr. Hough was not unnecessarily linked with the Bartkowiak murder, while not appearing so protective of Mr. Hough as to arouse the suspicion of the jury. In this case, defense counsel objected to attempts to link Mr. Hough directly to the Bartkowiak murder; he was overruled. Other attorneys may have taken a more aggressive approach to keeping out the information; another approach may have, in the end, been more efficacious. Counsel's approach, however, was not unreasonable.

Mr. Hough also takes issue with his counsel's failures to object during his own cross-examination. "Unaccountably," he states, "defense counsel failed to make any effort to prevent or restrict examinations into the details of Bartkowiak's torture and execution, and the prosecution again elicited evidence that Hough shot Bartkowiak in the head in a basement during the course of a robbery, admitted being present in the house for the robbery, and that Bartkowiak was handcuffed at the time he was shot." Petitioner's Br. at 29. We believe that this is an overstatement of defense counsel's presumed deficiencies. During the cross-examination of Mr. Hough, only two of the facts listed above were offered without objection. The prosecutor asked, without objection: "Was Mr. Bartkowiak, in fact, shot in the head in a basement?" Id. at 1106. Later in recross, the prosecutor established, without objection, that Mr. Hough participated in a robbery at the Bartkowiak home on the day of the murder. Mr. Hough also said, however, that, although he had been present at the house immediately prior to the murder, he was unaware that the murder was going to occur. See Tr. 1106. Defense counsel did interject when the prosecutor asked Mr. Hough whether Bartkowiak was handcuffed when he was shot and whether Mr. Hough was present when Bartkowiak was killed. We do not believe that defense counsel's efforts fell below an objective standard

of reasonableness under the circumstances./6

3.

State's Exhibit 21

Mr. Hough next submits that he was deprived of effective assistance of counsel when his attorneys failed to object to State's Exhibit 21. That exhibit included, among other items, a probable cause affidavit that detailed the Bartkowiak murder. It also contained the sentencing determination of the judge in the Bartkowiak trial that there were no mitigating factors and that the murder was horrendous and senseless. In Mr. Hough's view, this document was unduly prejudicial and its contents were inadmissible under Indiana law. It therefore was unreasonable for defense counsel not to object to its admission.

To resolve this issue, we must determine whether the Supreme Court of Indiana addressed this issue and, if so, whether its decision is contrary to, or an unreasonable application of, existing law as interpreted by the Supreme Court. With respect to this claim of ineffective assistance, the Supreme Court of Indiana stated:

Without citing to any authority, defendant argues that the evidence [State's Exhibit 21] was both hearsay and irrelevant. However, the evidence was relevant to prove one of the alleged aggravators, a previous conviction for murder. Also, in light of the evidence and aggravating factors against defendant, any additional evidence contained in the affidavit and entry were not prejudicial. See Maisonet v. State, 448 N.E.2d 1052, 1055-56 (Ind. 1983).

Hough, 690 N.E.2d at 270-71. Here, unlike the issue of the testimonial evidence, the Supreme Court of Indiana clearly addressed this issue on the merits./7 Furthermore, in evaluating Mr. Hough's claim, the Supreme Court of Indiana correctly cited Strickland v. Washington as the governing case law, and performance and prejudice as the governing standard. Consequently, we are constrained by AEDPA only to assess whether the determination of the Supreme Court of Indiana that the admission

without objection of State's Exhibit 21 did not result in a constitutional violation was an unreasonable application of the Strickland v. Washington test.

An ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence. If evidence admitted without objection was admissible, then the complained of action fails both prongs of the Strickland test: failing to object to admissible evidence cannot be a professionally "unreasonable" action, nor can it prejudice the defendant against whom the evidence was admitted. Indeed, "'[o]nly in a rare case' will a court find ineffective assistance of counsel based upon a trial attorney's failure to make an objection that would have been overruled under the then-prevailing law." Lucas v. O'Dea, 179 F.3d 412, 420 (6th Cir. 1999)./8 Consequently, we turn to an examination of Indiana law to determine whether, at the time of trial, an objection to State's Exhibit 21 would have been sustained or overruled.

At the time of Mr. Hough's trial, the Supreme Court of Indiana recently had handed down Maisonet v. State, 448 N.E.2d 1052 (Ind. 1983). In Maisonet, the defendant alleged that the trial court erred in admitting certain exhibits during a habitual offender proceeding. Among the exhibits admitted there was (1) charging information for the crime of assault and battery with intent to kill, and (2) admission documents from the Indiana Department of Corrections for the same offense. The documents contained a brief summary of the circumstances surrounding the assault and battery as well as of another offense, entering with intent to commit a felony. The Supreme Court of Indiana held that "[a]lthough it is true that the statute requires only that the state prove that defendant has two prior unrelated felony convictions, relevant information connected with those convictions is not generally considered to be prejudicial." Id. at 1056. In reviewing Mr. Hough's case, the Supreme Court of Indiana relied upon Maisonet.

Despite the similarity between the type of evidence at issue in Maisonet and that admitted in the present action, Mr. Hough urges that we find ineffective assistance on the basis of Thompson v. State, 690

N.E.2d 224 (Ind. 1997). Thompson involved introduction of other-crime evidence into the guilt phase of a capital trial. The Supreme Court of Indiana held that, although it may have been within the trial court's discretion to admit evidence of other crimes (robbery) to connect the defendant with the murder weapon (stolen during the robbery), other details concerning the prior crime (that the victim of the robbery was killed "execution style") were "unfairly prejudicial" and "had no bearing on whether Thompson stole the murder weapon . . . that day." Id. at 234. Thompson, therefore, addresses the guilt phase of a trial as opposed to the punishment phase of the trial and stands for the unremarkable proposition that evidence of other crimes is admissible in such a proceeding for only very narrowly defined circumstances. Notably, Thompson was handed down within one week of the Supreme Court of Indiana's decision in Mr. Hough's case. Nevertheless, the Supreme Court of Indiana apparently determined that neither Thompson, nor its case-law underpinnings, was applicable to Mr. Hough's allegations concerning State's Exhibit 21.

The question whether Mr. Hough's counsel was ineffective when he failed to object to State's Exhibit 21 rests on the Indiana law of evidence. As we have just noted, governing Indiana case law makes clear that State's Exhibit 21 would have been admitted in the face of an objection by counsel. In assessing Mr. Hough's claims, the Supreme Court of Indiana cited that case law and determined that State's Exhibit 21 was both relevant and admissible. We shall not second guess the Supreme Court of Indiana on a point of state evidentiary law. Consequently, we cannot say that its determination of counsel's effectiveness, based on that law, was unreasonable./9

4.

Introduction of Juvenile Record

Mr. Hough next argues that counsel rendered ineffective assistance by asking him to recount portions of his juvenile record. Mr. Hough states that, during his direct examination, his "counsel elicited several criminal acts Mr. Hough had committed as a juvenile, apparently under the misapprehension that such crimes were

admissible as impeachment. They were not." Appellant's Br. at 33. The Supreme Court of Indiana concluded that Mr. Hough was not prejudiced by this evidence.

Mr. Hough fails to identify where during his testimony this questioning occurred. We have reviewed Mr. Hough's testimony in some detail and only have located questions and responses concerning Mr. Hough's record as an adult. Mr. Hough did testify to a 1976 burglary charge that was initiated in juvenile court. However, this charge was transferred out of juvenile court, and Mr. Hough was tried as an adult on the charge. Any ineffective assistance of counsel for failing to object to testimony given by Mr. Hough concerning his juvenile record, therefore, finds no support in the record.

Mr. Hough also takes issue with his counsel's failure to object to cross-examination of other witnesses by the prosecutor regarding his juvenile file. During the sentencing phase of the trial, trial counsel introduced testimony from several of Mr. Hough's former probation officers. One of those officers, John Mauch, testified concerning Mr. Hough's difficult childhood. His testimony was not based on his independent recollection, but on the social history that Mauch had prepared for Mr. Hough's case file. See Tr. 1223-24. On cross-examination, the prosecutor elicited from Mauch some aspects of Mr. Hough's juvenile record and a psychological report that Mauch had relied upon in drawing up Mr. Hough's social history. Mr. Hough claims that his attorney's failure to object to questions put to Mauch concerning the psychological evaluation constituted ineffective assistance.

Mr. Hough's arguments fail on the merits. Mr. Hough offered his difficult childhood as a mitigating factor; one disinterested witness to those difficulties was Mauch. Notably, Mr. Hough does not argue that his counsel should not have offered his troubled past as a mitigating factor, nor does he contend that his counsel erred in calling Mauch as a witness. Once Mauch testified concerning Mr. Hough's childhood, the prosecution was entitled to test both Mauch's knowledge of that childhood and

his credibility as a witness. See State v. Owings, 622 N.E.2d 948 (Ind. 1993) (stating that right to cross-examination is "fundamental" and "includes the right to ask pointed and relevant questions in an attempt to undermine the opposition's case, as well as the opportunity to test a witness's memory, perception and truthfulness"). Furthermore, the prosecution was entitled to question Mauch concerning any materials he had referenced in creating the social history from which he had testified. Consequently, defense counsel's failure to object was not substandard performance.

5.
Closing Arguments

Mr. Hough also maintains that his counsel were ineffective because they failed to object to unduly prejudicial arguments by the prosecutor. In order to evaluate Mr. Hough's claims, we first must review in detail the arguments made by the prosecutor.

The prosecutor spoke in closing and final arguments for twenty-six pages of text. Much of the closing argument was dedicated to reviewing the law of aggravation and mitigation. However, on several occasions, the prosecutor made reference to the details of the Bartkowiak murder. Specifically, the prosecutor invited the jury to "[t]ake a look at his conduct. Remember Antonio Bartkowiak? You know, basements muffle noise don't they? . . . Shoot somebody in the head, you know very well that they're dead. Head shot to Mr. Antonio Bartkowiak, handcuffed, helpless, in a basement to absorb sound." Tr. 1309. Later, the prosecutor again turned to the Bartkowiak murder: "Antonio Bartkowiak was helpless on his living room floor. Did the murder occur then? He was questioned with an electrical cattle prod, as to where all of his valuables were." Id. at 1315.

In addition, the prosecutor, on at least one occasion, referenced Mr. Hough's lack of remorse. He stated: "You know, you saw Kevin on this witness stand, and I asked him about Antonio Bartkowiak. Did you ever hear the words, 'I'm sorry.' You never will, because he's not. He honest to God is not. He's a sociopathic

personality. He will never feel remorse." Id. at 1313.

In part of his closing argument, and again in his final argument, the prosecutor also appealed to the jury's sense of duty. Near the end of the state's closing argument, the prosecutor stated: "Sitting before you, ladies and gentlemen, is one of the most dangerous sociopaths in our society. It's a plain, pure and absolute fact. And you have the responsibility to address that issue with your guts and what you know, you have to do under your oath. You really do." Id. at 1320. The prosecutor followed up on this idea later:

If you do not follow your duty, I'm going to submit to you that you will depreciate the seriousness of this crime. You will. And that's why you have to take a look at where your duty takes you, and you absolutely have to say to that Judge, you know, Your Honor, we don't have any doubt that this man has knowingly or intentionally killed all three men . . . . [I]f you don't want to depreciate the seriousness of this crime, of these crimes, of these corpses, these men whose lives were shed for nothing in the sanctity of their own home, then you're going to have to do what you took an oath to do.

Id. at 1321.

Finally, in his final argument, the prosecutor suggested that, if the jury did not impose the death penalty, they would be killing by omission. He argued:

One thing that I learned is there's two ways to kill. You kill be commition [sic], and you kill by omission. And once you put on the responsibility of the Prosecutor, baby, that's just how it is. Whether you like it or not. If you're that final constitutional authority to make and to call whether you file it, you kill one way or the other potentially you absolutely do. . . . And you, I said that you, are no longer you, you are part of that criminal justice system, you're just like me. You can kill one or two ways potentially. Honestly you can. You can kill by commission, by making a recommendation that will be very important or you can kill by omission. It's not a choice of whether or not you

are or you aren't. It's a choice of you're going to follow the law, you're going to follow the evidence.

Id. at 1330.

In its opinion, the Supreme Court of Indiana acknowledged the impropriety of some of the prosecutor's comments. "It is unfortunate," commented the court, "that the State, armed with the evidence and the aggravating circumstances that it had, still resorted to potentially inflammatory statements." Hough, 690 N.E.2d at 271. The Supreme Court of Indiana, however, concluded that Mr. Hough was not "placed in grave peril because, even without these remarks, the jury was still confronted with three substantial aggravating factors." Id.

a.

Mr. Hough argues that the prosecutor's comments on his lack of remorse were improper under state law and drew attention to his failure to testify at sentencing, thus violating his Fifth Amendment rights./10 In United States v. Ramos, 932 F.2d 611 (7th Cir. 1991), we set forth the burden that a defendant must meet in order to invalidate a sentence based on a prosecutor's comment on the defendant's silence. We stated:

Although a mere formality in many cases, a defendant, as a predicate to relief, must be able to establish a reference to his or her silence. In determining whether such a reference exists, we follow the same standard that we use in analyzing alleged comment on a defendant's failure to testify at trial. Under this standard, we must determine whether: (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or (2) the remark was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's silence.

Id. at 616 (internal quotation marks and citations omitted). We do not believe that the one reference in the prosecutor's closing argument to Mr. Hough's lack of remorse can be characterized as commentary that violates Mr. Hough's Fifth Amendment rights. The prosecutor stated: "You know, you saw

Kevin on this witness stand, and I asked him about Antonio Bartkowiak. Did you ever hear the words, 'I'm sorry.' You never will, because he's not. He honest to God is not. He's a sociopathic personality. He will never feel remorse." Tr. 1313. In the present case, Mr. Hough took the stand in his own defense. The prosecutor asked him about the prior murder, and he admitted to the conviction. In closing argument, the prosecutor commented upon the testimony actually given, not Mr. Hough's choice to remain silent. Mr. Hough does not explain how the prosecutor's actions fall within one of the standards set forth above; indeed, he does not even cite the standard in his brief. Consequently, we shall not hold that the prosecutor's argument on Mr. Hough's testimony violated the Fifth Amendment.

b.

   Mr. Hough next points to a series of arguments made by the prosecutor that, in his view, appealed to the passion and prejudice of the jury, and therefore undermined his right to due process. Specifically, in the penalty phase argument, the prosecutor told the members of the jury that they would depreciate the seriousness of the crime if they did not impose the death penalty. Later, the prosecutor also explained to the jury that he had a special role and could kill by omission or commission. When the individuals on the jury took their oath, continued the prosecutor, they also assumed the power to kill by omission or commission.

   In evaluating this argument, the Supreme Court of Indiana first reviewed the standard against which the prosecutor's remarks would be measured. "In order to show prejudice from prosecutorial misconduct, one must show first, that there was misconduct by the prosecutor and second, that the misconduct placed the defendant in grave peril." Hough, 690 N.E.2d at 271 (citing Lowery v. State, 640 N.E.2d 1031, 1038 (Ind. 1994)). "Grave peril," continued the court, "is measured by the probable persuasive effect of any misconduct on the jury's decision and whether there were repeated instances of misconduct which would evidence a deliberate attempt to improperly prejudice the defendant." Id.

(internal quotation marks and citations omitted). Applying this standard, the court determined that, although the remarks were improper, they were not prejudicial. It held:

The State concedes that several of these remarks were objectionable, and we agree. It is unfortunate that the State, armed with the evidence and the aggravating circumstances that it had, still resorted to potentially inflammatory statements. However, in the context of this trial we do not believe that defendant was placed in grave peril because, even without these remarks, the jury was still confronted with three substantial aggravating factors.

Id.

Before this court, both parties appear to agree that at least some portion of the prosecutor's argument was problematic. Consequently, we turn to the question of whether Mr. Hough was prejudiced by the prosecutor's closing arguments.

In evaluating prosecutorial misconduct under governing Supreme Court law, it is not enough that the prosecutor's remarks were "undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations and quotation marks omitted). As we pointed out in Howard v. Gramley, 225 F.3d 784, 793 (7th Cir. 2000), Darden sets forth several factors to inform this inquiry: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut."/11 These factors, however, are not to be applied in a rigid manner, but should be used as a guide to determine whether there was fundamental unfairness that infected the bottom line. For that reason, we often have characterized the weight of the evidence as "the most important consideration." United States v. Morgan, 113 F.3d 85, 90 (7th Cir.

1997); see also Gramley, 225 F.3d at 793.

   The Supreme Court of Indiana did not recite with precision the factors set forth in Darden, but evaluated the impact of the prosecutor's arguments using the common rubric of Indiana law. The court asked whether the prosecutor's comments placed Mr. Hough in "grave peril." Grave peril is measured, in large part, by "the probable persuasive effect of any misconduct on the jury's decision." Hough, 690 N.E.2d at 271 (quoting Lowery, 640 N.E.2d at 1038). The Supreme Court of Indiana determined that, because of the presence of "three substantial aggravating factors," Mr. Hough's trial was not compromised, and he was not placed in grave peril.

   We cannot fault the Supreme Court of Indiana for its conclusion. Essentially, the court focused on the Darden factor that we have characterized as the most important. See Gramley, 225 F.3d at 793./12 We note, moreover, that only a few of the remaining Darden factors can be said to weigh in Mr. Hough's favor: Mr. Hough's counsel did not invite, and did not have an opportunity to rebut, some of the prosecutor's remarks. Significantly, more of the remaining Darden factors suggest that the prosecutor's arguments did not affect the result. First, the prosecutor did not misstate the evidence, nor was a specific right, such as the right to remain silent, implicated. In addition, the trial court specifically instructed the jury that "[a]rguments, statements and remarks of counsel were intended to help you in understanding the evidence and applying the law, but are not evidence. Any argument, statement or remark had no basis in the evidence, then you should disregard that argument, statement or remark." Tr. 1349. Consequently, the jury was on notice that the arguments were nothing more than counsel's interpretation of the evidence. Furthermore, defense counsel did have an opportunity to rebut at least some of the prosecutor's questionable statements in his closing argument. See Tr. 1334 (replying to the prosecutor's arguments that a penalty less than death would depreciate the seriousness of the crime). Finally, the jury was presented with overwhelming evidence of three aggravating factors compared to sparse

evidence in mitigation.

   Because the prosecutor's comments do not rise to the level of a constitutional violation as set forth in Darden, defense counsel's failure to object to those arguments cannot be considered prejudicial for purposes of the Strickland analysis.

c.

   Mr. Hough also urges that the arguments of counsel created non-statutory aggravating factors that the jury then considered in its deliberations./13 These factors, he contin-ues, are grounds for reversal under Sochor v. Florida, 504 U.S. 527 (1992). To determine the validity of this contention, we first must review the decisions of the Supreme Court regarding the use of aggravating factors in the death sentence calculus.

(1)

   The Supreme Court analyzes the effect of an invalid factor differently depending on whether the state involved is a "weighing" or "nonweighing" state. In a weighing state, aggravating factors play a special role in both stages of the death penalty selection process. First, aggravating factors in weighing states are used to determine if a defendant is eligible for the death penalty; unless at least one statutory aggravating factor is found, the judge or jury may not impose the death penalty. Second, in weighing states aggravating factors also play a critical role in the selection process. Only statutory aggravating factors are weighed against mitigating factors to determine if the death sentence is appropriate. See Coleman v. Ryan, 196 F.3d 793, 798 (7th Cir. 1999), cert. denied, 531 U.S. 848 (2000); see also Hameen v. Delaware, 212 F.3d 226, 249 (3d Cir. 2000) ("[D]uring this latter stage under a 'weighing statute,' the jury is required to weigh only the statutory aggravating factors against any mitigating factors."), cert. denied, 121 S. Ct. 1365 (2001).

   Aggravating factors do not have the same import in non-weighing states. In a nonweighing state, aggravating factors are used to determine a defendant's eligibility for the death penalty.

However, their special role then ends. Once a defendant is determined to be death eligible in a non-weighing state, "the jury is instructed not to give any particular weight to statutory aggravating factors," but to "take into consideration all circumstances before it from both the guilt-innocence and the sentence phases of trial." Coleman, 196 F.3d at 798 (internal quotation marks and citations omitted). The Supreme Court has stated that the difference between "weighing" and "nonweighing" states

is not one of "semantics" . . . but of critical importance. In a nonweighing State, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceedings. But when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.

Stringer v. Black, 503 U.S. 222, 231-32 (1992) (citations omitted).

The Supreme Court has addressed, in a number of cases, the constitutional impact of a judge's or jury's consideration of an invalid factor in a weighing state. Although Mr. Hough relies upon Sochor v. Florida, Sochor was preceded by Clemons v. Mississippi, 494 U.S. 738 (1990), and we begin our discussion there. In Clemons, a Mississippi jury had convicted the defendant of murder and sentenced him to death. The state supreme court upheld the death penalty after one of the statutory aggravating factors had been invalidated as unconstitutionally vague. The Supreme Court held that, when an invalid statutory aggravating factor was considered during sentencing, a weighing state could not rely on the other valid factors and automatically affirm the sentence; that course of action "would

not give defendants the individualized treatment that would result from actual reweighing of the mix of mitigating and aggravating circumstances." Id. at 752. However, the Court stated that it was not necessary to remand for resentencing if the state court had engaged in a reweighing of the valid factors. In the absence of reweighing, the state appellate court must find harmless error beyond a reasonable doubt. Because the Mississippi Supreme Court did not clearly take either of these paths, the Supreme Court remanded.

Sochor v. Florida, 504 U.S. 527 (1992), further elaborated upon the rule set down in Clemons. In Sochor, the jury had been instructed improperly that it could consider the "coldness" of the crime in imposing the death sentence. The state supreme court determined that the evidence in the record did not support the "coldness" instruction; nevertheless, it upheld the sentence because "[s]triking one aggravating factor when there are no mitigating circumstances does not necessarily require resentencing. Under the circumstances of this case, and in comparison with other death cases, we find Sochor's sentence proportionate to his crime." Id. at 531 (citations and internal quotation marks omitted).

The Supreme Court began its analysis by summarizing its holdings in Clemons and related cases. It stated:

In a weighing state like Florida, there is Eighth Amendment error when the sentencer weighs an "invalid" aggravating circumstance in reaching the ultimate decision to impose a death sentence. Employing an invalid aggravating factor in the weighing process "creates the possibility . . . of randomness," by placing a "thumb [on] death's side of the scale," thus "creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty." Even when other valid aggravating factors exist, merely affirming a sentence reached by weighing an invalid aggravating factor deprives a defendant of "the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances."

Id. at 532 (citations omitted). The Court found it impossible to determine from the state supreme court's language whether it found the error harmless beyond a reasonable doubt. Consequently, the Court concluded:

Although we do not mean here to require a particular formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny, a plain statement that the judgment survives on such an enquiry is clearly preferable to allusions by citation. In any event, when the citations stop as far short of clarity as these do, they cannot even arguably substitute for explicit language signifying that the State Supreme Court reviewed for harmless error.

Id. at 540.

Sochor and Clemons, therefore, stand for the proposition that, when an "invalid" aggravating factor is considered in sentencing in a "weighing" state, a state appellate court must either reweigh the aggravating circumstances against the mitigating circumstances, engage in a meaningful harmless error analysis, or remand for resentencing.

(2)

Mr. Hough does not set forth with precision how he believes Clemons and Sochor require reversal of his sentence. In his brief and at oral argument, he appears to argue that both the heinousness of the Bartkowiak murder and the likelihood that he will commit another murder as evidenced by his lack of remorse are the invalid factors that the prosecutor asked the jury to consider. It appears that Mr. Hough believes that these factors are "invalid" because they are not identified as aggravating factors in Indiana's death penalty statute. Finally, Mr. Hough concludes, because the jury considered these illegitimate factors, and because the Supreme Court of Indiana did not reweigh the factors or engage in harmless error analysis, then he must be resentenced.

In order for Clemons/Sochor to be implicated, the jury must have considered an "invalid" aggravating factor. However,

there is no evidence that the jury considered the allegedly "illicit" factors. Mr. Hough has not pointed to any part of the instructions, the record of the jury's deliberation, or his sentencing proceeding that suggests that the jury or the judge, in their respective sentencing roles, treated either the heinousness of the Bartkowiak murder or Mr. Hough's propensity to commit future crimes as aggravating factors. Thus, we are not presented with the same situation as in Clemons or Sochor in which the jury was instructed to consider the factor that was later determined to be invalid. See Sochor, 504 U.S. at 529; Clemons, 494 U.S. at 740. Indeed, in the present case, the jury instructions were limited only to the aggravating factors set forth in Indiana's death penalty statute, the validity of which Mr. Hough does not contest. See Tr. 1342-46. Furthermore, absent compelling evidence to the contrary, Indiana juries are presumed to have followed the court's instruction. See Funk v. State, 714 N.E.2d 746, 748 (Ind. App. 1999). Without any evidence that the jury or judge considered nonstatutory aggravating factors, Clemons and Sochor are not applicable./14

C.  Instructional Error

As his final argument, Mr. Hough claims that the trial court "incorrectly instructed" the jury that "it could only consider mitigating circumstances found to exist beyond a reasonable doubt, and that the mitigating circumstances must outweigh the aggravating circumstances." Appellant's Br. at 41. The Supreme Court of Indiana addressed this issue/15 and acknowledged that, "if his allegations [were] true, then the instruction would be unconstitutional under Mills v. Maryland." Hough, 690 N.E.2d at 274./16 The court concluded, however, that the trial court had not improperly deprived the jury of the right to consider all mitigating circumstances, but had instructed the jury according to state law.

Our analysis begins with a review of the jury instructions given. The trial court instructed the jury no less than five times that the state had the burden of proving, beyond a reasonable doubt, any aggravating circumstances and also

proving, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances. See Tr. 1198-99, 1341-42, 1346-47. At one point during the opening instructions of the penalty phase and again during the final instructions in the penalty phase, the court slightly restated the "weighing" standard; the court instructed on both occasions: "If the State failed to prove beyond a reasonable doubt the existence of at least one aggravating circumstance or if you find that any mitigating circumstances outweigh the aggravating circumstances, you should not recommend the death penalty." Id. at 1199, 1346. The court also instructed the jury that it could consider any mitigating circumstances; it did not give an instruction requiring Mr. Hough to prove mitigating circumstances beyond a reasonable doubt. Finally, the court instructed the jurors that "[e]ach of you must refuse to recommend the death penalty unless you are convinced beyond a reasonable doubt that the State has met its burden of proof." Id. at 1347.

After reviewing the record, we find no support for Mr. Hough's contention that the jury was instructed that "it could only consider mitigating circumstances found to exist beyond a reasonable doubt." Furthermore, there is no indication in the record that the jury believed that it had to find unanimously the existence of a mitigating factor before the mitigating factor could be considered. Consequently, we believe the Supreme Court of Indiana reasonably concluded that the instructions do not run afoul of Mills v. Maryland.

Conclusion

For the reasons set forth in the foregoing opinion, the judgment of the district court is affirmed.

AFFIRMED

FOOTNOTES

/1 Mr. Hough did not receive the death penalty for that crime.

/2 Mr. Hough has not suggested that the state court's determination of the facts in this case was unreasonable. Therefore, we need not consider or discuss this prong

of the statute.

/3 We previously have pointed out that prejudice may be based on the cumulative effect of multiple errors. See Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir. 1989). Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient. See id.

/4 In his petition to the Supreme Court of Indiana, Mr. Hough states: "Defense counsel failed to timely object to the prosecutor's eliciting of facts concerning the aggravating factor of a prior murder conviction. The facts of the prior conviction were not relevant to the weighing in this case. (Tr. 1315)." R.34, Ex.E at 30. The transcript citation, however, does not refer the court to any section of the transcript in which the prosecutor was "eliciting . . . facts"; the citation refers to a portion of the prosecutor's closing argument during sentencing.

Viewed most charitably toward Mr. Hough, it could be argued that Mr. Hough raised the issue of his counsel's failure to make a relevance or prejudice objection when the prosecutor elicited these facts, but failed to identify the correct passage in the transcript in support of this issue. However, even if we view the statement in that vein, as opposed to characterizing it as raising an issue concerning the prosecutor's closing argument, we do not believe that Mr. Hough "properly presented his claim[ ] to the state court[ ]" so as to avoid a procedural default. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). In this statement, Mr. Hough does not present either the operative facts or the controlling legal principles to the Supreme Court of Indiana. See Wilson v. Briley, 243 F.3d 325, 327 (7th Cir. 2001). With respect to the operative facts, neither the text nor the citation refer the court to the alleged failures of counsel during the cross-examination of Mr. Hough or the redirect examination of Mr. Maley. Indeed, the portion of the prosecutor's closing argument that is referenced makes no mention of either of those examinations. Consequently, because Mr. Hough did not recite, reference or describe facts elicited during the

testimony of Mr. Hough or Maley, we do not believe that he presented the "operative facts" of this issue to the state supreme court.

Furthermore, the statement of the issue to the Supreme Court of Indiana also did not include even a passing reference to the "controlling legal principles" that should guide the court. See Williams v. Washington, 59 F.3d 673, 677 (7th Cir. 1995). In Wilson, 243 F.3d at 327, we reiterated the factors that

bear upon whether the petitioner has fairly presented the claim in state court: (1) whether the petitioner relied on federal cases that engage in constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

"If none of the four factors is present," we continued, "then this court will not consider the state courts to have had a fair opportunity to consider the claim." Id. at 327-28. Here, none of the four factors is present, and we must conclude that Mr. Hough has failed to fairly present this issue to the Supreme Court of Indiana.

/5 See Ballard v. State, 318 N.E.2d 798, 806 (Ind. 1974) ("Ballard opened up the general subject of his statements to police by testifying that the statements were part of plea bargaining. Having done so, the trial court acted within its discretion by permitting the State to explore the details of these statements."); Kimble v. State, 451 N.E.2d 302, 306 (Ind. 1983) (holding that State was entitled to conduct redirect examination on motivations of witness in seeking terms of plea agreement when defense counsel had opened the door to the subject on cross-examination).

/6 In addition to arguing that his counsel should have objected to this evidence on the basis of prejudice or relevance, Mr. Hough also maintains that this testimonial evidence, either alone

or in conjunction with Exhibit 21 and the prosecutor's argument, created a non-statutory aggravating factor that tainted the jury's sentencing determination. Mr. Hough raised this issue before the Supreme Court of Indiana in cursory fashion; he stated: "Defense counsel failed to timely object to the prosecutor's eliciting of facts concerning the aggravating factor of a prior conviction. The facts of the prior conviction were not relevant to the weighing in this case. (Tr. 1315)." R.34, Ex.E at 30. For the reasons set forth in footnote 5, supra, we could not fault the Supreme Court of Indiana if, for lack of factual or legal support, it had not addressed this argument. However, that court appears to have resolved the issue:

Defendant argues that he was prejudiced because the evidence (such as his juvenile record and facts concerning the prior murder conviction) added non-statutory aggravating factors to the jury's consideration. However, the jury was instructed to consider only the three alleged circumstances. Furthermore, there is no indication that this evidence amounted to any prejudice as the jury was presented with evidence of three aggravating circumstances, and we do not believe defendant has shown a reasonable probability that the outcome would have been different absent these pieces of evidence.

Hough v. State, 690 N.E.2d 267, 271-72 (Ind. 1997). As will be explained in greater detail in section II.B.4.d., we, like the Supreme Court of Indiana, do not believe that the Supreme Court's jurisprudence on non-statutory aggravating factors has any clear application to the present situation. Zant v. Stephens, 462 U.S. 862 (1983), and its progeny--the authority cited in support of this argument--addressed situations in which the sentencer explicitly considered a factor in the death penalty equation that was later found to be invalid, usually because the state supreme court had determined that the factor was vague. Here, the jury was instructed based on valid, statutory aggravating factors, and there is no indication that something other than those factors played a role in either the jury's recommendation or the judge's sentence. Finally, even if there were

some argument that this line of cases should be extended to the present situation, AEDPA limits our review to determining whether a state court's determination is contrary to, or an unreasonable application of, "clearly established" law as set forth by the Supreme Court.

/7 Mr. Hough maintains that the Supreme Court of Indiana gave short shrift to this argument, that it paid little, if any attention, to the actual contents of State's Exhibit 21 and, therefore, its opinion should be given little weight. We cannot so easily dismiss the action of our colleagues on the Supreme Court of Indiana. Under AEDPA, it is a state court's resolution of an issue, as opposed to its reasoning process, that must be treated with deference. See Hennon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997) ("It doesn't follow that the criterion of a reasonable determination is that it is well reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case. Which it is here, however deficient the discussion of the reasons for so believing by the state appellate court."); Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) (holding that it is a state court's "ultimate decision," and not its rationale, that should be evaluated for reasonableness). /8 Cf. United States v. Snyder, 872 F.2d 1351, 1358 (7th Cir. 1989) ("Counsel's failure to object to other Rule 404(b) evidence is insignificant where, as we have already noted, it is unlikely that the objection would have been sustained."); Williams v. Carter, 85 F. Supp. 2d 837, 840 (N.D. Ill. 1999) ("It is not deficient performance to fail to raise an argument with no real chance of success or where the objection would have been properly overruled if it had been made.").

/9 Mr. Hough also suggests that the admission of this evidence was tantamount to the jury's considering a non-statutory aggravating factor, a methodology forbidden in a weighing state such as Indiana. Mr. Hough cites Zant v. Stephens, 462 U.S. 862 (1983), in support of this statement. We believe that this argument meets with several obstacles. First, it is questionable whether Mr.

Hough presented this constitutional argument to the Supreme Court of Indiana. Before the Supreme Court of Indiana, Mr. Hough only argued that his attorney should have objected to Exhibit 21 on relevance and hearsay grounds, see R.34, Ex.E at 26; he never argued that Exhibit 21 created a non-statutory aggravating factor that marred the jury's deliberations. In light of the this specific challenge, Mr. Hough's brief reference to "the prosecutor's eliciting of facts concerning the aggravating factor of a prior murder conviction" can be read as not encompassing Exhibit 21. If so, he has procedurally defaulted this claim. See O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). On the other hand, the state supreme court's treatment of this general issue of non-statutory aggravating factors, see supra note 7, may have been intended to address Exhibit 21 as well as the testimonial evidence. Second, as was mentioned in note 7, and will be discussed in greater detail later in this opinion, the methodology set forth in Zant has no clear application to the present action.

/10 Mr. Hough did not articulate this argument fully before the Supreme Court of Indiana. However, the state does not argue that Mr. Hough procedurally defaulted this claim and, therefore, it has waived that argument. See Pisciotti v. Washington, 143 F.3d 296, 300 (7th Cir. 1998).

/11 The considerations also have been formulated accordingly: "(1) the nature and seriousness of the prosecutorial misconduct; (2) whether the conduct of the defense counsel invited the prosecutor's remarks; (3) whether the trial court's instructions to the jury were adequate; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant." United States v. Durham, 211 F.3d 437, 442 (7th Cir. 2000).

/12 We have employed this approach on more than one occasion, see United States v. White, 222 F.3d 363, 371 (7th Cir. 2000) (noting that "[f]inally, and most importantly, the overwhelming evidence of White's guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's

deliberations or exploited the Government's prestige in the eyes of the jury" (internal quotation marks omitted)); Swofford v. Dobucki, 137 F.3d 442, 445 (7th Cir. 1996) ("While the prosecutor's comments might have been improper, we do not believe that they tainted Swofford's trial with unfairness in light of the weight of evidence against him.").

/13 Mr. Hough presented this issue (with respect to the prosecutorial argument) in his opening brief to the Supreme Court of Indiana only in passing. He stated: "Such commentary adds additional non-statutory aggravating factors into the weighing process which is impermissible under the statue and the Federal and Indiana Constitutions." R.34, Ex.E at 30. The subject was covered in slightly more detail in his reply brief. See id., Ex.K at 7. The Supreme Court of Indiana did not address this argument specifically in its opinion, and we cannot fault it for its failure to do so. Given Mr. Hough's failure to present either the operative facts or the controlling legal principles to the Supreme Court of Indiana in a timely fashion, it could be argued that he procedurally defaulted this claim. Nevertheless, because the state has not argued procedural default to us, we address Mr. Hough's argument and review the claim de novo. See Braun v. Powell, 227 F.3d 908, 917 (7th Cir. 2000) (stating that when a state court fails to adjudicate a claim on the merits, we "must rely upon the general standard as set forth in 28 U.S.C. sec. 2243 . . . to dispose of the matter as law and justice require" (internal quotation marks and citations omitted)), cert. denied, 121 S. Ct. 1164 (2001).

/14 Mr. Hough also maintains that even if his counsel's failures, considered independently, do not rise to the level of a Sixth Amendment violation, the cumulative effect of these errors does. We do not agree. As set forth above, the only potential error of Mr. Hough's counsel was the failure to object to the prosecutor's closing argument. We previously have held, albeit in a context other than ineffective assistance of counsel, that "[i]f there are no errors or a single error, there can be no cumulative error." United States v.

Allen, 2001 WL 1249266, at *3 (7th Cir. Oct. 19, 2001). The logic of this statement applies with no less force in the context of ineffective assistance of counsel.

/15 The Supreme Court of Indiana found that the arguments had been waived, but addressed them on the merits because they were intertwined with the ineffective assistance claims. Hough, 690 N.E.2d at 274.

/16 In Mills v. Maryland, 486 U.S. 367, 384 (1988), the Supreme Court stated: "We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."