James R. SWOFFORD, Petitioner–
Appellant,

v.

Kenneth DOBUCKI, Warden,
Respondent–Appellee.

No. 95–2446.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1996.

Decided Dec. 6, 1996.*

On Remand from Supreme Court
of U.S., Nov. 17, 1997.

Submitted Nov. 20, 1997.

Decided Feb. 19, 1998.**

* *Swofford v. DeTella*, 101 F.3d 1218 (7th Cir.1996).

** After an examination of the original briefs filed in this case and the record, we have concluded that oral argument and rebriefing are unneces- sary. Accordingly, we consider the appeal on the existing pleadings and the record. *See* Fed. R. App. P. 34(a); Cir. R. 34(f).

Jerold S. Solovy (submitted on briefs), Robert T. Markowski, Brent E. Kidwell, Jenner & Block, Chicago, IL for Petitioner–Appellant.

Catherine Glenn, Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before CUMMINGS, ESCHBACH and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

An Illinois jury convicted James Swofford of aggravated sexual assault for anally raping a three year-old boy. At trial, the judge excluded potentially exculpatory evidence pursuant to the Illinois Rape Shield Law, 725 ILL. COMP. STAT. 5/115–7. The Illinois appellate courts upheld his conviction on direct appeal. *People v. Swofford*, 229 Ill.App.3d 1118, 207 Ill.Dec. 940, 648 N.E.2d 640 (table), *review denied*, 146 Ill.2d 648, 176 Ill.Dec. 818, 602 N.E.2d 472 (1992). We affirmed the district court's denial of Swofford's petition for a writ of habeas corpus. *Swofford v. DeTella*, 101 F.3d 1218 (7th Cir.1996). In doing so, however, we applied the restrictive standard of review prescribed by The Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1). The Supreme Court granted Swofford's petition for certiorari, vacated our decision, and remanded the case to us with instructions to apply the *de novo* standard of review that prevailed before the AEDPA became effective. *See Lindh v. Murphy*, —— U.S. ——,

117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Abrams v. Barnett*, 121 F.3d 1036, 1038 (7th Cir.1997). While this—like many sexual abuse cases—is a close case on the evidence, we again conclude that the district court properly denied Swofford's petition.

## I. BACKGROUND

Swofford was convicted of sexually abusing J.S., a three year-old boy. Swofford lived with J.S.'s family for a short time and baby-sat J.S. and his two siblings. The Department of Children and Family Services (DCFS) removed all three children from their home in 1988 on the basis of suspected abuse and neglect. The DCFS worker assigned to the case had reason to believe that the children had been sexually violated. A medical examination and interviews with nurses and social workers confirmed these fears. J.S. claimed that three people had sexually abused him: his mother, his father, and Swofford. A grand jury indicted all three for aggravated sexual assault. J.S.'s parents pleaded guilty to the lesser charge of "improper supervision of a child," but Swofford refused to plead and took his case to trial.

This turned out to be a risky strategy in light of the trial court's application of the Illinois Rape Shield Law. Pursuant to this statute, the judge excluded all references to J.S.'s alleged abuse by his parents; this constituted inadmissible evidence of the victim's "prior sexual activity." 725 ILL. COMP. STAT. 5/115–7. Within these limited parameters, the evidence at trial strongly suggested Swofford's guilt and he had little hope of refuting it. First, J.S. (who was five years-old at the time of trial) testified that Swofford abused him. Second, two DCFS workers testified that J.S. told them that he had been assaulted. Third, a nurse testified that J.S. told her that "Jim Bob" (Swofford's nickname) had hurt him. Finally, a physician discussed the physical evidence which indicated that J.S. had been sexually abused. In response, Swofford presented only the testimony of his grandmother as, essentially, a character witness. Because he was not allowed to point to other potential sources of

any abuse, Swofford defended himself by questioning the credibility of J.S.

In closing arguments, however, the State inappropriately exploited any adversarial advantage provided by the Rape Shield Law. The prosecutor knew that J.S. had accused both of his parents, as well as Swofford, of sexual abuse. The prosecutor knew that the jury did not (and could not) know this fact. Yet, he overplayed his advantage by asking the jury how J.S. could possibly describe anal rape in such graphic terms unless attacked by Swofford. The prosecutor made this argument not once, but twice—once in his first closing statement and once in rebuttal. Swofford's counsel did not object to either of these statements. The jury disbelieved Swofford's assertion that J.S. was not a credible witness, and it required only forty-five minutes of deliberation to return a guilty verdict.

## II.  DISCUSSION

Swofford petitions for a writ of habeas corpus on three grounds. First, he argues that the prosecutor's intentional mischaracterization of the facts in closing arguments constituted reversible prosecutorial misconduct. Second, he contends that his lawyer's failure to object to these statements rose to the level of ineffective assistance of counsel. Finally, he argues that his lawyer's performance was also unconstitutionally ineffective based on the failure to challenge the application of the Rape Shield Law to these circumstances. We previously held that, under the AEDPA, none of the Illinois courts' rejections of these arguments on direct appeal represented an unreasonable application of federal law as interpreted by the Supreme Court. *See Swofford,* 101 F.3d at 1225. We now conclude that, even under the more permissive *de novo* standard of review, we cannot find fault with the Illinois courts' decisions.

### A.  Prosecutorial Misconduct

■ Swofford argues that the prosecutor's closing remarks deprived him of a fair trial.[1] The Illinois appellate courts held otherwise.

We excerpt the key portions of the prosecutor's statements below:

I sat here and heard that description of what that little boy gave as to what happened in his mom's bedroom that day, and he used the best words he had command of, the best words he could grasp, to describe a violent, anal sexual assault that was perpetrated on him by this man. There is no other circumstance, ladies and gentlemen, that could have happened to that little five year old boy—three years old when it happened—that describes this situation other than what I have just alleged and what we have charged this man with.

\*    \*    \*    \*    \*    \*

And you have to bear in mind, too, that at five years of age, [J.S.] should not have the kind of sexual knowledge that he showed you while he testified.

Swofford's counsel did not object to these remarks. Instead, he used his closing statement to attack their very foundation; he challenged J.S.'s credibility and adhered to the position that no abuse occurred at all. Thus, the prosecutor returned to the point in rebuttal:

[J.S.] corroborated himself from his description of the event that happened. And if this event didn't happen, ladies and gentlemen, where did he get the information what happened to him to make him dream up this wild, bizarre set of circumstances?

Once again, Swofford's counsel did not object.

Swofford claims that the prosecutor's comments violated his right to a fair trial. In *Darden v. Wainwright,* 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986), the Supreme Court relied upon six factors in evaluating a due process claim arising from a prosecutor's inappropriate comments in closing argument: (1) whether the prosecutor manipulated or misstated the evidence, (2) whether the comments implicated other specific rights of the accused (such as the right to remain silent), (3) whether the

---

1.  The remand of this case did nothing to alter our earlier conclusion that this issue was not procedurally defaulted. *See Swofford,* 101 F.3d at 1222.

comments were invited by or responsive to defense counsel's summation, (4) whether the trial court's instructions ameliorated the harm, (5) whether the evidence weighed heavily against the defendant, and (6) whether the defendant had an opportunity to rebut the prosecutor's comments. *See also United States v. McClinton,* 135 F.3d 1178, 1188–89 (7th Cir.1998). These are not the only relevant considerations in assessing the fairness of Swofford's trial; they are only helpful guides in answering the ultimate question of "whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden,* 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

While the prosecutor's comments might have been improper, we do not believe that they tainted Swofford's trial with unfairness in light of the weight of evidence against him. Our previous opinion in this case discussed the way in which the prosecutor manipulated the evidence in his closing, and we incorporate our analysis of that issue into our opinion today. *See Swofford,* 101 F.3d at 1223. The State contends that Swofford invited the remarks by impugning J.S.'s credibility in opening statements by alleging that J.S. fabricated his story of abuse in order to gain placement in a comfortable foster home. This, however, did not constitute a proportionate invitation from Swofford because this theory was never developed through testimony or in closing argument. Nevertheless, once again, we are persuaded that the comments did not render Swofford's trial unfair because the totality of the evidence suggested his guilt.

The State proved that J.S. had been abused by *someone,* and two witnesses established that Swofford was the perpetrator. Because of the Rape Shield Law, Swofford could only attempt to discredit the State's evidence that abuse occurred and J.S.'s accusation that Swofford was involved. This approach proved unsuccessful in light of the great weight of evidence to the contrary. Most damaging to Swofford's case, J.S. identified Swofford in the courtroom as his rapist.

J.S. offered an incredibly graphic and heart-wrenching description of Swofford's sexual assault:

Q: What happened? Are you telling the truth now?

A: He put the wiener in my butt.

\*  \*  \*  \*  \*  \*

Q: Okay. Did anything come out of his wiener, [J.S.]?

A: Pee.

\*  \*  \*  \*  \*  \*

Q: What color was the pee?

A: White.

\*  \*  \*  \*  \*  \*

Q: Did you see anything else on his wiener?

A: Red.

\*  \*  \*  \*  \*  \*

Q: What was causing the red?

A: Probably just this blood on him.

\*  \*  \*  \*  \*  \*

Q: Whose blood was it?

A: Mine.

This emotionally powerful testimony contained indicia of trustworthiness based on the other witnesses presented by the State. Two DCFS workers testified that J.S. had told them on a prior occasion that he had been assaulted, and a nurse testified that J.S. had told her that Swofford was the one who had "hurt him". A doctor stated that physical evidence corroborated J.S.'s accusation.

To be sure, Swofford's credibility argument found support in some confused portions of J.S.'s testimony. For instance, immediately after the judge excused him from the witness stand, J.S. asked, "Did I tell the truth?" In addition, his responses to some questions might have raised credibility doubts in the minds of the jurors. In response to a question about *where* the assault took place, J.S. answered, "Yesterday. Yesterday. Tomorrow." When the questioning did turn to the matter of *when* the assaults occurred, J.S. answered: "It was five days. One, two, three, four, five. It was just seven, eight, nine, ten. Ten days." The jury might have considered these answers, as well as his young age, as factors undermining the credi-

bility of his entire accusation against Swofford.

Our speculation is irrelevant, though, because the jury made the entirely reasonable finding that Swofford perpetrated the charged crime. The trial boiled down to a pure credibility determination, and J.S.'s story was strongly corroborated while Swofford's denials could not be supported by any evidence. In this context, therefore, we cannot say that the prosecutor's remarks led the jury to convict Swofford where they might otherwise have acquitted him. Indeed, the question improperly raised by the prosecutor—how else could J.S. have gained his graphic sexual knowledge?—was a question that must already have been on the minds of the jurors when reviewing the evidence; the court's application of the Rape Shield Law prevented Swofford from providing an effective answer to this question and, thus, the prosecutor's comments probably did not affect the jury's decision to convict. We therefore cannot hold that the prosecutor's closing remarks rendered Swofford's trial fundamentally unfair.

## B. Ineffective Assistance of Counsel

Swofford argues that his trial counsel provided ineffective assistance in two distinct ways. First, he argues that his lawyer should have objected to the prosecutor's inappropriate remarks during · closing arguments. Second, he argues that his counsel should have done more to introduce evidence that J.S. had been sexually abused by others. In order to prove a Sixth Amendment violation, Swofford must demonstrate both that his counsel's performance fell below an objective standard of reasonableness and that this inadequate performance affected the result of the trial. *See* Strickland v. Washington,

466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Neither of Swofford's claims passes this difficult test.

■ We have previously noted that "[i]t is often beneficial for courts to consider the prejudice prong of *Strickland's* test before delving into murkier questions of whether certain acts or decisions constituted reasonable legal advocacy." *Winsett v. Washington*, 130 F.3d 269, 280–81 (7th Cir.1997). Swofford cannot show the requisite prejudice from his counsel's alleged error in failing to object to the prosecutor's remarks in closing arguments. The jury faced two questions: did any abuse happen, and, if so, by whom? The Rape Shield Law operated to narrow the field of possible suspects so that once the jury concluded that someone abused J.S., Swofford was the only potential perpetrator. As we have stated, the weight of the evidence was such that the jury would have convicted Swofford without any encouragement that might have been provided by these remarks; the jury would have convicted Swofford even if his counsel had objected. Thus, the decision not to object did not affect the outcome of the trial,[2] and Swofford's first ineffective assistance claim fails.

■ Similarly, although a much closer call, we do not believe that Swofford can show the requisite level of prejudice by his counsel's failure to challenge the application of the Rape Shield Law as a Confrontation Clause violation. He cannot demonstrate a reasonable probability that the result of the trial would have been different if his counsel had made this argument. *See Wright v. Gramley*, 125 F.3d 1038, 1041 (7th Cir.1997). Even assuming that he was allowed to bring in evidence that J.S. also accused his parents of abuse, this would have had only a limited effect; it only would have provided an expla-

---

**2.** Swofford's Sixth Amendment claim would falter on the second *Strickland* test, as well. Although we cannot know for sure, counsel's failure to object was probably an intentional, strategic decision. The trial court's interpretation of the Rape Shield Law prevented the jury from learning about other possible abusers of J.S. Thus, defense counsel could only attack the State's evidence that *any* abuse occurred. An objection would have only highlighted the impact of the prosecutor's statement that J.S. would not have had such · graphic sexual

knowledge unless he was abused—a proposition against which Swofford's entire defense rested. Furthermore, objecting to the accusation that Swofford was the only possible perpetrator might have been dangerous because the defense could not put forward any other plausible abuser due to the Rape Shield Law. Swofford therefore cannot "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quotation omitted).

nation for the physical evidence consistent with abuse and perhaps some basis for J.S.'s detailed sexual knowledge. Our review of the record, however, leads us to conclude that it would have done little to discredit J.S.'s powerful accusation that Swofford abused him, and it would have done nothing to counter the nurse's corroborating testimony that J.S. earlier told her that Swofford had "hurt him." Indeed, without the Rape Shield Law, Swofford would only have gained the ability to posit that J.S. might have wrongly attributed any abuse committed by his father to Swofford. This theory would have been dubious, though, because it is highly unlikely that J.S. would have confused Swofford with a well-known figure like his own father. The Rape Shield Law operated to limit Swofford's defense options, but it did not sufficiently impact the basic credibility determination that comprised the jury's verdict.

Thus, we reject both of Swofford's claims of ineffective assistance of counsel.

## III. CONCLUSION

For the foregoing reasons, we again affirm the district court's denial of Swofford's petition for a writ of habeas corpus.