In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4679

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DENARD MORRIS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:03-CR-62—**Theresa L. Springmann**, *Judge.*

ARGUED JANUARY 12, 2007—DECIDED AUGUST 20, 2007

Before POSNER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Denard Morris was convicted on various drug charges, for which he received a typically severe sentence of 262 months' incarceration. His appeal centers on alleged governmental misconduct at the trial. Morris's cousin, Tramayne Peterson, pleaded guilty to Count I of the indictment and testified against Morris as part of a plea bargain with the government. When questioned about his plea deal at trial, Peterson asserted that the mandatory minimum sentence for his plea was 10 years; the prosecutor reinforced this by arguing to the jury on multiple occasions that Peterson could not get less than 10 years. Following Morris's conviction, the government moved under 18 U.S.C. § 3553(e) and U.S.S.G.

§ 5K1.1 for Peterson to be sentenced below the mandatory minimum to a 70-month term; the court granted that motion. While we conclude that the prosecutor did commit misconduct by misleading the jury about the plea deal that the government reached with Peterson, this act was not enough to infect the fundamental fairness of the entire proceeding. With the exception of Morris's challenge to the concurrent sentence he received on Count II, which the prosecution agrees is beyond the statutory maximum and must be fixed on remand, all of his other arguments lack merit. Thus, with that minor qualification, we affirm.

**I**

On August 15, 2003, Tramayne Peterson was looking for a ride to the mall, when Morris, his cousin, pulled up in a white van. Peterson hopped in. A few blocks later, the men drove past Officer George Valdez, Jr., of the East Chicago police force. Officer Valdez recognized Morris, having seen his picture during that day's squad briefing. Knowing there was an active bench warrant for Morris's arrest, Valdez pulled the van over.

According to Peterson's testimony, he had just finished "rolling marijuana" when Officer Valdez pulled behind the van. As Morris stopped the van, he handed Peterson a grey plastic bag and said, "Take this and run." Peterson did and Officer Cima DeVilla gave chase. Although Peterson claimed not to know what was in the bag when his cousin handed it to him, as Peterson ran and jumped a fence, "stuff"—beginning with "a white substance" that he "figured . . . to be cocaine"—began to fall out of the bag. Peterson continued to run as a .45 caliber pistol, baggies of marijuana and cocaine, and an electronic scale all tumbled out behind him. Eventually Peterson dropped the bag. After vaulting over a few more fences, he was

apprehended by a third officer, Anton West. Meanwhile, Officer Valdez arrested Morris without incident. No additional drugs, firearms, or other contraband was found on Morris's person or in the van.

Following his arrest, Morris was indicted on one count of possession of cocaine base in the form of crack with intent to distribute, one count of possession of marijuana with intent to distribute, both in violation of 21 U.S.C. § 841(a)(1), and one count of carrying a firearm during and in relation to a drug crime, in violation of 18 U.S.C. § 924(c). He was convicted of the first two counts after a jury trial and sentenced to 262 months on each count.

## II

Morris has taken a kitchen-sink approach to his appeal, raising multiple legal challenges out of a few discrete factual constellations. Two basic claims, however, predominate: insufficiency of the evidence and prosecutorial misconduct. We briefly explain the legal standards that apply before turning to the specifics of his arguments.

Defendants challenging the sufficiency of the evidence supporting their conviction face an extremely high burden. We will reverse " 'only if, after viewing all of the evidence in a light most favorable to the government, and drawing all reasonable inferences therefrom, . . . a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt.' " *United States v. Moore*, 446 F.3d 671, 677 (7th Cir. 2006) (quoting *United States v. Rivera*, 825 F.2d 152, 158-59 (7th Cir. 1987)).

Claims of prosecutorial misconduct are also difficult to sustain. When evaluating a claim of prosecutorial misconduct, "the ultimate question [is] 'whether the prosecutor['s] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.' "

*Swofford v. Dobucki*, 137 F.3d 442, 445 (7th Cir. 1998) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation omitted)). In reviewing allegations of improper comments by a prosecutor, this court employs a two-step process. "We first look at the comments in isolation to determine if they were improper." *United States v. Castillo*, 148 F.3d 770, 775 (7th Cir. 1998). Factors the Supreme Court has found helpful in evaluating whether comments were improper include the following:

> (1) whether the prosecutor manipulated or misstated the evidence, (2) whether the comments implicated other specific rights of the accused (such as the right to remain silent), (3) whether the comments were invited by or responsive to defense counsel's summation, (4) whether the trial court's instructions ameliorated the harm, (5) whether the evidence weighed heavily against the defendant, and (6) whether the defendant had an opportunity to rebut the prosecutor's comments.

*Swofford*, 137 F.3d at 444-45 (citing *Darden*, 477 U.S. at 181-82). "If we find the comments are proper, the analysis ends. If we find they are improper, we must then examine the comments in light of the record as a whole to determine whether the comments deprived the defendant of a fair trial." *Castillo*, 148 F.3d at 775.

### 1. Misleading the jury as to Peterson's sentence

Morris's most substantial allegations center on Peterson's testimony and the government's use of it in its arguments to the jury. He argues that Peterson's testimony was false and misleading based on the following exchange with Assistant U.S. Attorney Robert N. Trgovich, the prosecutor, during direct examination:

Q: What's the government going to do for you under that plea agreement?

A: Just sentence me; they said they was going to make a recommendation to sentence me at the low end of the guidelines.

Q: And what about with respect to Counts Two and Three?

A: They was going to dismiss them.

Q: Do you understand what type of sentence you're looking at under Count One?

A: Yes, sir, I do.

Q: *And what is that sentence*?

A: *Ten years*.

Q: *And is that a mandatory sentence*?

A: *Yes, sir*.

(Emphasis added.) Peterson reiterated these assertions during cross-examination.

Building on Peterson's statements, AUSA Trgovich affirmatively represented to the jury several times that Peterson would be subject to a mandatory minimum sentence of 10 years. At the beginning of the government's closing statement, he noted that Peterson had signed a plea agreement. He continued,

But what is Tramayne Peterson looking at? And he told you. He's looking at a mandatory minimum sentence, mandatory means common meaning has to be imposed, and minimum means this is the lowest he can get, ten years. So Tramayne Peterson was not given a pass for his testimony. He's not walking away at the end of the day free. He's gotten years.

Trgovich reinforced the notion that the sentence could not be less than 10 years by noting in his closing that "It would be agreed that a ten-year sentence is something. It's not—not facing anything," and in his rebuttal by remarking, "a mandatory sentence of ten years is not a great deal."

In fact, contrary to AUSA Trgovich's statements, there was nothing immutable about the 10-year term reflected in Peterson's plea agreement. As any prosecutor well knows, the government has the power to move for a reduction below the statutory minimum. And that is what it did. At Peterson's sentencing hearing, AUSA Trgovich himself joined in a motion requesting the court to give a sentence below the mandatory minimum based on the substantial assistance that Peterson had rendered to the government. See U.S.S.G. § 5K1.1 ("Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."). The court accepted the government's motion and calculated a new guideline range of 70 to 87 months. The court then sentenced Peterson to 70 months in prison, four years and two months shorter than the "mandatory" length the prosecutor had stressed at Morris's trial.

Morris finds three separate reasons why this course of events entitles him to a reversal of his conviction. First, he claims that the AUSA improperly bolstered Peterson's testimony, by giving the jury the erroneous impression that Peterson no longer had a motive to lie. Second, Morris argues that the prosecutor's failure to disclose the government's intention to request a sentence below 10 years violated his Sixth Amendment rights by depriving him of the opportunity to impeach Peterson's testimony fully. Finally, he argues that if Peterson's testimony had been presented in the proper light, the jury would have dis-

counted it so thoroughly that the remaining evidence would have been insufficient to convict.

We agree with Morris that AUSA Trgovich's comments amounted to prosecutorial misconduct. Although the government argues to this court that its comments at trial were meant only to suggest that Peterson *thought* that he was facing an irreducible ten-year sentence, and maybe that is what the prosecutor intended to say, in fact he said much more. He told the jury flatly that there was no way that Peterson could get less than 10 years in prison, emphasizing that "mandatory means . . . has to be imposed, and minimum means this is the lowest he can get, ten years." This goes beyond any comment about what Peterson's understanding of his plea agreement was, and we make no comment on how we would regard a statement limited to something like "Mr. Peterson told you that he understands he will spend at least ten years in prison."

No competent Assistant U.S. Attorney is unaware of the existence of U.S.S.G. § 5K1.1. Trgovich plainly knew that it was within the government's discretion to ask the judge to impose a sentence below the normal statutory minimum, if Peterson lived up to his end of the plea agreement—that is exactly what wound up happening. It was therefore improper both to give the jury the impression that Peterson's sentence could not go below 10 years during his examination of Peterson, and then later to argue the same thing to the jury, at least when it is obvious that the United States had not firmly rejected the possibility of the § 5K1.1 motion.

As the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), makes clear, this kind of conduct strikes at the heart of the integrity of the trial. There, the Court faced a case where the government had failed to disclose an alleged promise made to its key

witness that he would not be prosecuted if he testified for the government. The Supreme Court reiterated that "rudimentary demands of justice" are violated when "'the State, although not soliciting false evidence, allows it to go uncorrected when it appears.'" *Id.* at 153, citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Here, the prosecutor's misleading statement ran the risk of facilitating untruthful testimony from Peterson, and it deprived Morris of potential impeachment evidence in violation of *Giglio*. See also *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000). The possibility of a lower sentence, awarded in part precisely because of the assistance he was providing at Morris's trial, provided an incentive for Peterson to say whatever the prosecutor wanted to hear.

Because we have concluded that prosecutorial misconduct occurred here, we must go on to consider whether "in light of the record as a whole . . . the comments deprived the defendant of a fair trial." *Castillo*, 148 F.3d at 775. The Supreme Court has announced two different standards to employ in deciding whether improper comments were material. The easier standard for the defendant to meet, which is used where the prosecutor knowingly relies on false testimony, requires "the conviction [to] be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Braun*, 227 F.3d at 920 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Even under this favorable standard (which, we add, is not necessarily the best fit here), we cannot conclude on this record that AUSA Trgovich's improper comments were material and therefore deprived Morris of a fair trial. The picture the jury had before it of Peterson's plea agreement made it aware that he was receiving a substantial benefit for his testimony and, more importantly, that he had strong incentives to please the government. Peterson revealed to the jury that in exchange for his

testimony, the government would drop two of the charges (Counts II and III) and would ask the court to give him a sentence at the bottom end of the guideline range. In addition, the court stressed that the jury would have to evaluate Peterson's credibility carefully. Although the jury might have recognized the potential for an additional reduction in Peterson's sentence as a marginally greater incentive for Peterson to tailor his testimony in favor of the government, the information that the jury had before it was not different enough to lead us to believe that there was a "reasonable likelihood" that the result would have changed. See *Giglio*, 405 U.S. at 154.

Morris's final argument about the prosecutor's emphasis on the statutory mandatory minimum focuses on the sufficiency of the evidence. Morris argues that had Peterson's bias been correctly stated the jury would have found his testimony otherwise so internally contradictory as to be unbelievable. Finding Peterson's testimony unbelievable, Morris continues, the jury would not have had sufficient evidence to link Morris to the drugs.

We need not belabor this point. It is enough to point out that the jury was entitled to disbelieve Peterson when he said that he did not know what was in the bag that Morris thrust on him at the moment of the encounter with the police. Juries pick and choose what to believe, not only from witness to witness, but also from statement to statement by one witness. This jury was entitled to conclude that Peterson was lying about that detail, but that the general picture he portrayed was true. The government's theory was that once Peterson discovered the drugs, he intended to return them to Morris when that became feasible, which is why he initially kept carrying them as he ran. There is nothing in Peterson's testimony so internally inconsistent that the jury was compelled to disregard it. Looked at as a whole, the evidence was easily sufficient to support Morris's conviction.

A great deal of additional evidence linked Morris to the contents of the bag and to the crime. First, Drug Enforcement Agency (DEA) fingerprint specialist Joseph V. Ambrozich testified that he matched Morris's fingerprint, but not Peterson's, to one of the two fingerprints found on the drug scale that fell out of the grey bag while Peterson was running. Second, James Cronin, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified that the firearm that fell out of the grey plastic bag was purchased by LaToya Brown. Peterson testified that Morris had said that "LaToya [Brown] had left it in the van that day, earlier that day at a friend's." In addition to Peterson's testimony linking Brown to Morris, East Chicago Police Officer Robert Aponte also testified that Brown had come into the police station to retrieve her cell phone, which had been left in Morris's van. Finally, as Officer Aponte testified, during the execution of a search warrant unrelated to Morris's case, the East Chicago police discovered a letter from Morris to one Biffy Mack, in which Morris referred to the crime. He puffed,

> I got this shit beat my cousin got caught with the shit I'm going to trial I've been taking care of him and gave him the Delta so he won't flip flop on me. But he cool now since they indicted us with a simple possession and firearms charge and he any facing shit if he cop out to count 1 possession and they drop his other firearms charge.

Given this additional evidence against Morris, we are confident that nothing in the treatment of Peterson as a witness undermined the sufficiency of the evidence supporting the verdict.

### 2. Admission of the bench warrant for Morris's arrest

Morris's second set of arguments stems from the district court's decision to allow the introduction of testimony

about the existence of a bench warrant for his arrest. Officer Valdez testified briefly about the bench warrant. He described noticing "the defendant in a white van coming towards me. We passed each other up. I remember seeing the defendant's picture in the squad room during a briefing that day, and I noticed he was wanted for an active bench warrant." The officer also mentioned that he "contacted dispatch to make sure the warrant was still active and to confirm the warrant." In closing argument, the prosecutor referred to the warrant to explain why Morris wanted the bag with the drugs and gun out of the van:

> [H]e further had to know that he was in all likelihood that he was stopped because of the warrant that was outstanding for him. And when you're stopped for a warrant, you're going to be arrested, which means the van is going to be towed, and searched. And what was in the van would have been discovered.

Morris argues that the admission of this evidence led to two errors. First, he claims that the testimony about the bench warrant exacerbated the alleged lack of evidence tying him to the drugs and allowed the jury to convict him based only on the assumption that he was a habitual offender and a fugitive from the law. Morris also submits that the prosecutor's references to the bench warrant in his closing argument were unfairly prejudicial.

The court's decision to admit references to the bench warrant is reviewed for abuse of discretion. See *United States v. Hale*, 448 F.3d 971, 985 (7th Cir. 2006). The government is barred by FED. R. EVID. 404(b) from introducing evidence of a defendant's bad acts in order to show that he acted on the occasion in question in conformity with his bad character. Evidence of a prior bad act may be admitted, however, when that act is "so 'inextricably intertwined' with, or 'intricately related' to, charged

conduct that it helps the fact finder form a more complete picture of the criminal activity." *Hale*, 448 F.3d at 985. Like all evidence, the bench warrant cannot be admitted into evidence if it is substantially more prejudicial than probative. FED. R. EVID. 403; see also *Old Chief v. United States*, 519 U.S. 172 (1997).

The district court did not abuse its discretion in admitting the officer's testimony about the bench warrant. The testimony about the warrant was not introduced to "prove that [Morris] is a person of bad character and likely therefore to have committed the crime of which he is accused in the present case." *United States v. Paladino*, 401 F.3d 471, 474-75 (7th Cir. 2005). The district court reasonably concluded that this testimony supplied a necessary part of the government's case. Without it, the prosecution could not have explained why Officer Valdez stopped Morris's van. Later, the prosecutor suggested to the jury that this testimony helped to explain Morris's motivation for telling Peterson to flee from the van. The district court was well within its discretion to strike the balance for purposes of Rule 404 where it did.

### 3. Additional claims of prosecutorial misconduct

Morris also alleges that the prosecutor committed misconduct by "vouching" for Peterson's truthfulness. Morris did not object to this argument at trial, and so we review only for plain error under FED. R. CRIM. P. 52(b). See *United States v. Clarke*, 227 F.3d 874, 884 (7th Cir. 2000). For reversal, there first must be "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). Moreover, reversal is not automatic if those three elements are established. In addition, before overturning a conviction we must find that "the error seriously affect[s] the

fairness, integrity, or public reputation of the judicial proceedings." *Johnson*, 520 U.S. at 467 (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)) (internal quotation marks omitted).

The rule against a prosecutor's vouching for a witness actually encompasses two different kinds of comments: first, "a prosecutor may not express her personal belief in the truthfulness of a witness," and second, "a prosecutor may not imply that facts not before the jury lend a witness credibility." *United States v. Thornton*, 197 F.3d 241, 252 (7th Cir. 1999). Morris claims only that an error of the first type occurred here.

He focuses on two of the AUSA's comments, both made in closing argument. In the first one, the prosecutor said that "[t]here was some reference as to what the government wants to hear. The government always, and only wants to hear the truth from cooperators. That's why in their plea agreement, as defendant Peterson told you, if he does not tell the truth, he loses his plea agreement." We have held on many occasions that the prosecutor "is entitled to get into evidence the fact that the [plea] deals are conditioned upon truthful testimony." *Thornton*, 197 F.3d at 255. The comments made here, focusing on the incentives provided by defendant's plea agreement for him to tell the truth, resemble a similar argument about a plea agreement that we accepted in *United States v. Renteria*, 106 F.3d 765, 766-67 (7th Cir. 1997). There, we concluded that "the prosecutor was free to invite the jury to draw a particular inference from [the plea agreement]. Defense counsel was free to urge a competing inference, as he did on numerous occasions. By arguing as they did, both sides respected the jury's ability to evaluate credibility based on the facts in evidence." *Id.* at 767 (internal citations omitted). That is all the prosecutor did here, and thus he did not in this respect cross any forbidden line.

Later, the prosecutor addressed Peterson's testimony that he just had "rolled marijuana" when Officer Valdez pulled the van over:

> Certainly at his plea hearing and here, he said he was rolling—he didn't say he was smoking, he testified he was rolling, okay? If [Peterson] was not telling the truth, and he was sworn here, that doesn't help his case, doesn't help you believe that—believe him, because it's something that he didn't say before. But he's sworn to tell the truth after his plea, and he's took an oath here to tell the truth. If he's making this all up, why would he add that fact? How does it help him? It doesn't. It's his effort to be totally candid and truthful about what happened on August 15th in the van.

This longer comment is a somewhat closer call, but in context we find no impermissible vouching. In addition to reiterating the incentives Peterson had for telling the truth, the prosecutor's statement addresses Peterson's inclusion in his testimony of the fact that he had been rolling marijuana. Marijuana, of course, is a controlled substance, and Peterson admitted to possessing some for personal use in his testimony. It was fair, we think, for the AUSA to suggest that Peterson had no reason to include that detail if he was not being truthful. In making this comment, the prosecutor's characterization was "based on what was in the record, not upon the prosecutor's own personal belief." *Clarke*, 227 F.3d at 884. There was no prosecutorial misconduct based on vouching.

Morris's final argument for prosecutorial misconduct is that the prosecutor commented on the defendant's failure to take the stand by saying in his opening statement that "at the end of the day, there is probably not going to be too much contested about this." This statement addressed the facts established by the testimony

of the three officers who stopped and arrested Peterson and Morris. The prosecutor was not commenting on the defendant's testimony or lack thereof. (In fact, there was not much contested about the traffic stop, as Morris's defense did not contest the events testified to by the officers. Instead, Morris's defense was that the drugs and firearm belonged to Peterson.) We find no error here, much less plain error.

### 4. Evidence that the drugs were crack

Morris's fourth set of arguments center on the government's supposed failure to prove that the drugs in question consisted of "50 grams or more of a mixture or substance . . . which contains cocaine base." 21 U.S.C. § 841(b)(iii). He submits that the government never sufficiently proved that the drugs in question were crack cocaine, rather than some other form of cocaine. Because he failed to object at trial, once again the standard of review is plain error.

Morris's first argument is that there was insufficient evidence to find that the drugs in question were crack. This is ground that we have often covered in other opinions. In *United States v. Edwards*, 397 F.3d 570, 573-76 (7th Cir. 2005), we held that the term "cocaine base" for purposes of § 841(b) borrows the definition contained in U.S.S.G. § 2D1.1. Under § 2D1.1, "'Cocaine base' . . . means 'crack.' 'Crack' is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." U.S.S.G. § 2D1.1(c), Note D. This definition distinguishes between both powder cocaine (cocaine hydrochloride) and cocaine bases and also between crack cocaine and other forms of cocaine base. As we noted in *Edwards*, "All crack is cocaine base but not all cocaine base is crack." 397 F.3d at 571.

Obliquely relying on our decision in *Edwards*, Morris argues that the government's expert relied on the definition of crack contained in the sentencing guidelines rather than on a scientific definition differentiating various forms of cocaine base. See 397 F.3d at 572-73. In *Edwards*, however, the defense produced expert testimony indicating that the samples tested "revealed none of the telltale signs of crack; among other things, the substances did not exhibit the color or form that results from the process of mixing cocaine hydrochloride (powder cocaine) with sodium bicarbonate to produce crack." *Id.* at 573. As a result, the district court concluded that while the substance at issue was cocaine base it was not crack, and the mandatory minimum did not apply.

This case is unlike *Edwards*, because the government produced substantial evidence that the drugs in question were crack and the defendant produced no evidence to the contrary. *Cf. Booker*, 260 F.3d at 823-24; *United States v. Abdul*, 122 F.3d 477, 478-80 (7th Cir. 1997). Morris focuses on the fact that the prosecution's expert, DEA Agent Fuelster, described one of the three different drug exhibits as "cocaine hydrochloride," which is the scientific name for the acid form of cocaine (usually found in powder form). The transcript as a whole, however, reveals this to be a simple misstatement. Agent Fuelster later said in response to the prosecutor's specific question about that exhibit that his tests revealed that the substance in question was cocaine base, as were the other two exhibits that he tested.

Other evidence corroborated the fact that the drugs in question were crack cocaine and not some other form of cocaine base. Agent Fuelster himself noted that "the material, as I received it, was kind of wet, which is not uncommon for crack." Officer DeVilla reinforced this point, testifying that he recovered from one spot "twelve individual rock-like substances that were wrapped individ-

ually in clear plastic bags," and from another "nine smaller bags of a yellowish-white, rock-like substance. . . . And there was a large amount of a white, yellowish-rock material inside." An agent from the DEA's crime lab described the usual method for packaging crack and opined that the crack cocaine in this case "was packaged for distribution." Finally, Officer Aponte testified that the drugs that were recovered were "packaged for distribution" as crack cocaine. The evidence, in short, left no doubt that the substance was crack cocaine. This means both that there was no problem of insufficiency of the evidence, and that counsel was not ineffective for failing to argue more strenuously that the substance was not crack.

### 5. Other sentencing errors

After *Booker*, the proper calculation of the guideline range is the first step in imposing a reasonable sentence. See *United States v. Mancari*, 463 F.3d 590, 597 (7th Cir. 2006). Morris makes two objections to the calculation of his guideline range on Count I. His first objection (which he failed to raise at trial, and thus is subject to plain error review) is that his acquittal on the charge of violating § 924(c) precluded the court as a matter of law from imposing the two-level enhancement on Count I for possession of a firearm under U.S.S.G. § 2D1.1(b)(1). This argument was not good before *Booker* and it has not grown better with time. As was true pre-*Booker*, "[c]onduct underlying an acquitted charge may be included as long as that conduct is proved by a preponderance of the evidence." *United States v. Frith*, 461 F.3d 914, 917 (7th Cir. 2006). Our account of the facts earlier also demonstrates that there was ample evidence to support the district court's finding that Morris at least constructively possessed the gun.

Morris's second objection is to the district court's calculation of his criminal history. He decries the fact that most of his criminal history points come from misdemeanor traffic offenses, arguing that only 5 of the 15 criminal history points come from serious felony offenses. That may be, but Morris identifies no error in the court's calculation of his criminal history. If all he means is that the ultimate sentence was unreasonable, we can review the court's decision. The judge specifically addressed the question whether the nature of Morris's prior offenses made the recommended guideline sentence unreasonable. She found that they were "serious crimes" and that "the sentence guidelines properly take account of that." Particularly in light of *Rita v. United States*, 127 S.Ct. 2456 (2007), which allows appellate courts to apply a non-binding presumption of reasonableness to a guidelines sentence that a district court has freely chosen, we see no reason why this sentence was flawed.

The only problem that requires correction is Morris's sentence on Count II. The court imposed a concurrent sentence of 262 months on that count, which charged Morris with possession of less than 50 kilograms of marijuana with intent to distribute. The 262-month term is above the 10-year statutory maximum for an individual with a prior conviction for a felony drug offense. See 21 U.S.C. § 841(b)(1)(D). As a result, this count must be remanded to the district court so that it can impose a new sentence that complies with the statute.

* * *

We REMAND the case to the district court for re-sentencing on Count II. In all other respects, we AFFIRM the judgment of the district court.

No. 05-4679 19

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*