In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3891

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

STEVEN WILBORN,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 951-1—**Matthew F. Kennelly,** *Judge.*

ARGUED JUNE 3, 2009—DECIDED AUGUST 10, 2009

Before EASTERBROOK, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* Steven Wilborn pled guilty to three counts of possession of a firearm by a felon, in violation of 18 U.S.C. §922(g)(1), and four counts of distributing a controlled substance, in violation of 21 U.S.C. § 841(a)(1). After a sentencing hearing, the district court determined that the substance Wilborn distributed was crack cocaine, as opposed to some other form of cocaine base. Wilborn disputes that finding, and we affirm.

**I.**

On four occasions in 2006, Wilborn sold cocaine to a confidential informant.[1] Each time, law enforcement agents equipped the confidential informant with audio and video recording devices and followed the informant to Wilborn's home. On August 30, Wilborn sold 26.2 grams of cocaine to the informant. On August 31, he sold 26.6 grams, and referred to the substance as "glass," a term relating to the quality or purity of the drug being sold. He told the informant he and his cousin had cooked it themselves. On September 13, Wilborn sold to the informant 26.8 grams of cocaine and a .380 caliber pistol. On November 1, Wilborn sold 69.8 grams of cocaine to the informant, referring again to the substance as "glass." After the November 1 transaction, law enforcement agents arrested Wilborn, searched his home, and found additional cocaine, packaged in eight small Ziploc-style plastic bags.

Wilborn does not dispute that the substance at issue is some form of cocaine base, claiming only that it is not crack cocaine. Crack dealers are subject to substantially harsher sentences than sellers of powder cocaine. *See* 21 U.S.C. § 841(b)(1)(A)(iii); U.S.S.G. § 2D1.1(c); *United States v. Stephenson*, 557 F.3d 449, 452 (7th Cir. 2009) (noting that, although recent congressional and judicial actions have lowered some of the sentences for dealing crack cocaine, crack sentences still are significantly higher than those for

---

[1] Wilborn raises no issues on appeal with respect to the firearms-related convictions.

other forms of cocaine); *United States v. Edwards*, 397 F.3d 570, 571 (7th Cir. 2005) (noting the ten-year statutory minimum sentence triggered by distributing five or more kilograms of powder cocaine, or fifty or more grams of crack cocaine, and citing guidelines provisions that apply harsher terms to crack than to powder cocaine). The sole issue on appeal is whether the district court clearly erred in determining that the controlled substance at issue was crack cocaine.

At the sentencing hearing, the government presented two expert witnesses to testify to the nature of the substances seized in the controlled buys and from the subsequent search of Wilborn's home. Government Exhibits 9, 10, 11, and 21 corresponded to the substances sold to the confidential informant on August 30, August 31, September 13, and November 1, respectively. Exhibit 17 consisted of the substance found in the search of Wilborn's home following his November 1 arrest. Fredericka Laux, a senior forensic chemist for the Drug Enforcement Administration, testified that she performed several tests on the substances and determined that each contained cocaine base in varying degrees of purity. Exhibits 9, 10, 11 and 21 ranged in purity from 36% to 45%, meaning that between 36% and 45% of the total weight of the sample was cocaine base, and the remainder of each sample was comprised of other materials. Exhibit 17, the one found in the search of

Wilborn's home, was 74.2% pure cocaine base.[2] The materials tested also contained sodium bicarbonate, a material commonly used in manufacturing crack cocaine, and cutting agents, among other things. Laux explained that she preserved a small sample of each exhibit prior to testing because the testing process requires her to grind the material in order to homogenize it. The grinding process changes the appearance of the substance. All of the substances tested appeared rock-like prior to testing, in varying shades of white and brown. During Laux's testimony, the district court judge viewed the samples in both their original forms and in the forms in which they appeared after grinding. Some of the samples contained moisture that was not initially visible but became apparent when the sample turned mushy after grinding.

Christopher Labno, a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified that, based on his extensive experience as an ATF agent, the substances seized from Wilborn were crack cocaine, as opposed to some other form of cocaine base. According to Agent Labno, "[c]rack cocaine is a street slang term for the smokable form of cocaine base." R. 86, at 55. He described the typical color of crack as a range of shades from off-white to a dark yellowish-brown, and the consistency as rock-like. He also testified

---

[2]  Laux testified that there was no typical level of purity that she found in cocaine samples she had tested in her career. Rather purity varied widely, and she had personally seen samples as low as 3% pure and as high as 91% pure cocaine base.

that, in his extensive experience with narcotics, he had seen many variations in both color and consistency, including crack that was still mushy or moist because it had not fully dried following the cooking process. Agent Labno explained that it is possible to smoke crack cocaine that is still moist. According to Labno, all of the cocaine recovered from Wilborn was consistent with the appearance of crack cocaine, it was packaged as crack would be packaged, and it was priced at market rates for crack cocaine. Moreover, Agent Labno had taken a statement from Wilborn after his arrest, during which Wilborn himself identified the substances as crack cocaine.

After hearing this testimony, personally examining the samples, and hearing the argument of counsel, the court ruled that all of the substances seized from Wilborn were crack cocaine. The court correctly noted the factors to consider in evaluating cocaine base, including color, texture, appearance, pricing, packaging, and the labels that buyers and sellers apply to it. The court found that the original samples were hard, rocky substances that ranged in color from white to off-white. After the grinding process, some of the samples had the appearance of wet sand or chocolate chip cookie dough. R. 86, at 79. The court found that all of the cocaine base was priced as crack cocaine, that Wilborn thought he was selling crack, and that his buyers believed they were buying crack. Moreover, unrebutted testimony demonstrated that even moist crack cocaine could still be smoked. R. 86, at 78-79. The court concluded that the government had proved by a preponderance of the evidence that the substances at issue were crack cocaine. The

court sentenced Wilborn to the low end of the guidelines range, 121 months' imprisonment on each of the drug counts, with the sentences to run concurrently.[3] Wilborn appeals.

## II.

On appeal, Wilborn concedes that the cocaine base found in his home, which was labeled Exhibit 17 during the sentencing hearing, was adequately shown to be crack cocaine because it had the color, appearance, composition, consistency and purity of crack cocaine that Congress and the Sentencing Commission intended to target. He contends that the evidence was insufficient to prove by a preponderance that the other substances at issue were crack cocaine. The district court's determination that the cocaine base exhibits were crack is a factual finding that we review for clear error. *Stephenson*, 557 F.3d at 452. Wilborn's main complaint is that the cocaine base he sold was not rock-like, and varied in color beyond what was typically expected for crack. Rather, the samples were described as being the consistency of mashed potatoes, wet sand, and chocolate chip cookie dough at various parts of the hearing. The color ranged from the typical off-white to a dark yellowish brown. Moreover, Wilborn complains, there was no evidence that the confidential informant believed he was buying crack cocaine. Nor was there any testimony

---

[3] Wilborn also received 120 month sentences on each of the firearms counts, also to run concurrently to each other and to the sentences for the drug counts.

that the cocaine was packaged in the manner crack is usually packed for sale, in the corners of plastic bags or in small plastic bags. Finally, he argues that the purity of all of the samples, except for Exhibit 17, was too low for the substance to be considered crack. All in all, he contends the evidence was insufficient to find by a preponderance that the substance was crack.

Rather than applying a rigid definition to the meaning of crack, which is admittedly not a scientific term, we have held that a sentencing judge must determine whether a substance is crack as those who buy and sell in the market would understand that term. *Stephenson*, 557 F.3d at 453. *See also Edwards*, 397 F.3d at 574 (noting that cocaine and cocaine base are chemically identical, and defining crack as "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rock-like form."); U.S.S.G. § 2D1.1, Note D. We consider a variety of factors in determining whether a particular sample of cocaine base is crack including the color, consistency, packaging, pricing, the manner in which the parties to the transaction refer to the substance, and whether the parties to the transaction recognize the substance as crack. *Stephenson*, 557 F.3d at 453 (identifying price, appearance, packaging, manner of transaction, and the understanding of the parties to the transaction as relevant factors in determining whether a particular substance is crack); *United States v. Kelly*, 519 F.3d 355, 363-64 (7th Cir. 2008) (listing form, color, packaging, and the words used by the buyer and seller as relevant to the calculus of whether a substance

is crack); *United States v. Morris*, 498 F.3d 634, 644 (7th Cir. 2007) (identifying color, consistency and packaging as relevant factors, and noting that wet crack is not unusual).

The first problem with Wilborn's argument is that it disingenuously describes the consistency of the substances at issue as being similar to mashed potatoes, wet sand, and chocolate chip cookie dough. Although some of the samples had these unusual consistencies after they had been ground up for testing, the district court personally viewed samples that were preserved before grinding and found that each sample had the characteristic rock-like, off-white appearance that the experts expected crack to have. Moreover, Laux testified that the post-grinding consistency was caused by pockets of water trapped inside the rocks of crack, probably due to insufficient drying time. R. 86, at 45-47. Agent Labno explained that a certain level of wetness could be expected because dealers often wait to cook powder cocaine into crack until they have received an order, so that they will not be caught possessing crack. Agent Labno also remarked that water added weight to the crack, which made the substance more profitable to dealers, who typically sell crack by weight. R. 86, at 59.

Laux testified that the darker color of the substances after grinding was due to the presence of other ingredients in the mixture. She also testified that the purity of the samples was not determinative because she had encountered cocaine base with wide-ranging levels of purity. Agent Labno testified that the crack was packaged as

he would expect crack to be packaged. The larger quantities were packaged as he expected wholesale quantities to be packaged, and the smaller quantities were packaged in the manner he expected user amounts to be packaged. Perhaps most damning for Wilborn was his own post-arrest statement to Agent Labno. In that statement, Wilborn himself repeatedly identified the substance that he sold to the confidential informant as crack cocaine. In short, the district court did not clearly err in accepting the testimony of two experts that Exhibits 9, 10, 11 and 21 consisted of cocaine base that was priced like crack, packaged like crack, and had the color and consistency of crack. *United States v. Branch*, 195 F.3d 928, 934 (7th Cir. 1999) (in determining whether a substance is crack cocaine, the district court alone decides the issue based on the evidence received, considering the credibility, knowledge and experience of the witnesses). Nor did the court clearly err in concluding that, given those findings and given Wilborn's own admissions, Exhibits 9, 10, 11 and 21 were crack cocaine as we have defined that term. To paraphrase James Whitcomb Riley, if cocaine base looks like crack, is priced like crack, is packaged like crack, and is sold as crack, it is probably crack.

AFFIRMED.